CECIL P. WILSON *vs.* MASSACHUSETTS INSTITUTE OF TECHNOLOGY.

MARY I. WELLS *vs.* SAME.

</div>

Suffolk.    December 1, 1904. — September 6, 1905.

Present: MORTON, LATHROP, BARKER, HAMMOND, LORING, & BRALEY, JJ.

*Equitable Restrictions.   Massachusetts Institute of Technology.*

St. 1861, c. 183, which incorporated the Massachusetts Institute of Technology, granted to that corporation the right to hold and occupy the westerly portion of a certain square of land then belonging to the Commonwealth between Newbury Street and Boylston Street in Boston " to the extent of two thirds part thereof, free of rent or charge by the Commonwealth," and provided in § 3 that the square in question should " be reserved from sale forever, and kept as an open space, or for the use of" the educational institutions named in the act, and in § 7 that the corporation above named, and another educational corporation to which a similar grant was made as to the remaining third of the square, should " not cover with their buildings more than one third of the area granted to

them respectively." These grants were made in pursuance of a scheme, pro-
posed by the petitioners for the grants, that the square in which the rights were
granted should be dealt with in such a way as to enhance the value of the sur-
rounding lots belonging to the Commonwealth, so that their increase in value
should equal the value which the reserved square had before the adoption of
the plan, and the Commonwealth thus should be reimbursed for the space with-
drawn from sale. This scheme was carried out, and the lots surrounding the
square belonging to the Commonwealth, after having been reserved under § 8
of the act until the square was built upon and improved by the two educational
corporations, were sold at auction in accordance with a plan signed by the com-
missioners of public lands, which was referred to in the advertisements, and a
copy of which was pasted in the catalogues of the sales. On this plan the re-
served square was shown with the buildings of the two corporations and the
open spaces drawn upon it. St. 1903, c. 438, released to the Massachusetts Insti-
tute of Technology all the right, title and interest of the Commonwealth by way
of right of re-entry or otherwise in the westerly two thirds of the square, and
provided that that corporation "subject to the rights, if any, of other parties "
might erect upon all or any part of the premises buildings conforming to the
building laws of the city of Boston and in accordance with certain restrictions
set forth in the act. The owners of two lots on one of the streets facing the
square, which had been purchased respectively at two of the auction sales above
described, brought suits in equity against the Massachusetts Institute of Tech-
nology to restrain that corporation from covering with its buildings more than
one third of the land assigned to it by St. 1861, c. 183. *Held,* that the provi-
sions of §§ 3 and 7 of the last named act, that the square should be reserved
from sale forever, and kept as an open space, or for the use of the educational
institutions named in the act, and that these institutions should not cover with
their buildings more than one third of the area granted to them respectively,
were addressed to the future purchasers of the surrounding lots as the basis
on which those lots were to be sold, and the lots of the plaintiffs having been
bought on the faith of these declarations, an equitable contract was created
which could be enforced specifically as a restriction on the land held by the
defendant, and that the plaintiffs were entitled to decrees enjoining the defend-
ant from erecting any building or buildings covering more than one third of the
area assigned to it by St. 1861, c. 183.

THE following statement of the case is taken from the opinion
of the court:

These are two bills in equity reserved for the consideration of
the full court upon the pleadings and agreed facts. They are
brought by the owners of two lots of land on Newbury Street in
the city of Boston, facing the square on which the buildings of
the defendant and those of the Boston Society of Natural His-
tory now stand, for the purpose of having the defendant enjoined
from covering with its buildings more than one third of the land
"granted" to it by St. 1861, c. 183, as it is authorized to do by
St. 1903, c. 438, " subject to the rights, if any, of other parties."
The bills proceed on the ground that by the sale under this act

(St. 1861, c. 183) of these and other lots surrounding the square, an equitable restriction was imposed upon this square for their benefit, which includes the right they now seek to enforce.

By §§ 1 and 2 of St. 1861, c. 183, the defendant is incorporated. By § 3 it is provided that the square in question "shall be reserved from sale forever, and kept as an open space, or for the use of such educational institutions of science and art as are hereinafter provided for." By § 4 it is provided that the defendant shall hold, occupy and control the westerly two thirds of said square, subject to the "stipulations" specified, and by § 5 it is provided that the Boston Society of Natural History "shall be entitled to hold, occupy and control" the easterly one third on certain provisions there specified. By § 6 it is provided that the rights and privileges given in the last two sections are granted subject to certain "further conditions" there specified. Then comes § 7, relied on by the plaintiffs, to wit: "The above named societies shall not cover with their buildings more than one-third of the area granted to them respectively." By §§ 8 and 9 the commissioners on the Back Bay are "instructed to reserve from sale the lots fronting on said square on Boylston, Clarendon and Newbury Streets, until said societies shall, by inclosure and improvements, put said square in a sightly and attractive condition," and it is directed that an appraisal shall be made of all the surrounding lots (except those on Berkeley Street which already had been sold) and of the square in question; and if the surrounding lands when sold do not equal the appraised value of the two (the surrounding lots and the square) the two societies shall pay the amount of the deficit to the Commonwealth for the school fund, to which the proceeds of the sale of these lands had been appropriated by the Legislature.

St. 1861, c. 183, was enacted on a petition asking for the incorporation of an institution "to be entitled the Mass: Institute of Technology," and that "a section of land on the Back Bay may be reserved and granted to the use of said Institute on such terms and conditions as may be deemed most conducive to the objects of the Institute and the industrial and educational interests of the Commonwealth," and on a petition by the Boston Society of Natural History asking for a similar

grant. These petitions were referred to the joint standing committee on education, who made a report which was set forth in the agreed facts and which is printed at the end of this statement, beginning with page 572. This committee reported a bill which is not made a part of this case, but " shortly afterwards the Act of St. 1861, c. 183, was passed " on April 10, 1861.

On September 5, 1861, the appraisal called for by § 9 was completed, and the land in the square and the land in the surrounding lots on Boylston, Newbury and Clarendon Streets was appraised at $1.05 a foot.

. A word as to what the Back Bay lands were will explain the occasion of the " grant " to these petitioners.

. What is now known as the Back Bay district of Boston was originally flats covered by the ebb and flow of the tide, and used for mill purposes. It became desirable to change the use of these flats from mill purposes to land purposes. The title to these flats was in the Commonwealth and the companies which owned the right of flowage. Before 1857 the Commonwealth had by an adjustment got title to all the land shown on the plan which was adopted by the Back Bay commissioners appointed under Resolve 1852, c. 79, and annexed to their fifth annual report rendered in January, 1857. A reduced copy of this plan is printed opposite page 571. The Commonwealth had determined to fill and sell these lands, and had laid out the land for that purpose by the adoption of this plan. See *Commonwealth v. Roxbury*, 9 Gray, 451 ; Fifth Annual Report of the Commissioners on the Back Bay ; Report of the Commissioners appointed under Resolve of 1856, c. 76, with accompanying documents, printed in Senate Document No. 17, for the year 1857 ; Resolves 1852, c. 79 ; 1855, c. 60 ; 1856, c. 76 ; 1857, c. 70 ; Sts. 1857, c. 169 ; 1859, c. 154 ; 1860, c. 200, § 5. The Commonwealth had thus come into an extensive territory from the sale of which a large profit was expected to result, after the cost of filling had been met. In 1861, when the act in question was passed (St. 1861, c. 183), these flats or lands were " being filled, but at that time, with other large tracts to the west and south, were almost entirely vacant, the residence portion of the city being east of Arlington Street and the business portion still more to the east."

The lots surrounding the square in question (forty-six in number) were sold at four different auction sales, severally held on September 29, 1863, May 19, 1864, October 26, 1865, and April 10, 1869.  The lot now owned by the plaintiff Wilson was bought at the second, and the lot now owned by the plaintiff Wells at the third, of these sales.  A plan annexed to the agreed facts sets forth the actual price received by the Commonwealth from the sale of the forty-six surrounding lots.  It is stated by the plaintiffs and not contradicted by the defendant that this plan shows that these forty-six surrounding lots were sold for $2.46$\frac{8}{9}$ a foot, and that the Commonwealth received from these sales $90,384.06 over and above the appraised value of the square here in question plus the appraised value of the surrounding lots under § 9 of St. 1861, c. 183.

As both the plaintiffs on the one hand and the defendant on the other hand have sought support from the way these sales were conducted, a short statement of it is necessary.

The surrounding lots consisted of twenty-two on Boylston Street, twenty-two on Newbury Street, and two on Clarendon Street.  The lots fronting the square on Berkeley Street had been sold before St. 1861, c. 183, was enacted, as we already have said ; and, as we have said, all that were sold after that act were sold at public auction.  Those on Boylston Street were sold on September 29, 1863.  The twenty-two lots on Newbury Street were offered for sale on May 19, 1864, and fifteen of them were sold then.  The remaining seven were sold on October 26, 1865, and the two lots on Clarendon Street were sold on April 10, 1869.

In case of all forty-six lots the purchaser took a bond for a deed, followed by a conveyance later, — in one instance twenty-eight years later.  The explanation for this course of conducting the transaction is obvious ; so long as the title to it stood in the Commonwealth a lot of land was not subject to taxation by the local authorities.

The four auction sales were advertised.  The advertisements of the sales at which the two lots now owned by the plaintiffs were bought ended with this statement : " Catalogues with plans showing the situation and area of the several lots to be sold, and the minimum price of each, together with form of deed to be

given by the commissioners and full particulars in regard to the restrictions and stipulations to be incorporated therein, may be obtained " at the office of the commissioners.

The catalogue in case of the first of these two auction sales (the second of the four) covered lots on Commonwealth Avenue as well as the twenty-two lots in question on Newbury Street; and in case of the second of these two sales, (the third of the four,) besides the seven lots here in question, other lots on Newbury Street and lots on Commonwealth Avenue and Beacon Street.

The plan referred to in the concluding paragraph of the advertisement was pasted inside the catalogue. It was the only statement contained in the catalogue of what was to be sold and of the upset prices fixed by the commissioners with the approval of the Governor. It was not otherwise referred to in the catalogue. A copy of the plan so referred to in the advertisement and pasted in the catalogue at the first of these two sales (the second of the four) shows this square laid out as provided in St. 1861, c. 183. A reduced copy of this plan is printed opposite this page. The plan referred to in the advertisements and pasted in the catalogue at the second of these sales (the third of the four) was the same as the one above mentioned, with this difference : In the one used at the later sale the names of the purchasers of the several lots sold at the former sale were added. The plans used at the first and fourth sales were also the same, with similar differences as to the absence or presence of the names of purchasers of lots.

The form of deed referred to in the catalogues for the first three of the above four sales was a printed form adopted before St. 1861, c. 183, and apparently used for the sale of all lots on the Back Bay indifferently. It referred to the plan of 1857 alone. It will be observed that on this plan the land is not divided into lots. After November, 1866, the form of deed set forth in the catalogues referred " also to the plan recorded with Suffolk Deeds at the end of Book 885," which is in fact a plan showing the square here in question laid out as provided in St. 1861, c. 183. Of the forty-six lots here in question only two, namely, those on Clarendon Street, were sold under such a catalogue.

Exhibit K.K.
PLAN OF LANDS
belonging to the
COMMONWEALTH of MASSACHUSETTS.

Exhibit A.
PLAN OF LANDS
BELONGING TO THE
COMMONWEALTH
OF
MASSACHUSETTS.

S. P. FULLER
Civil Engineer and Surveyor

Two plans were referred to in the bonds for a deed given for all the lots except those given for three, namely, the plan of 1857 above set forth and a sale plan of lots on Commonwealth Avenue and Marlborough Street, recorded November 5, 1860, Book 788, p. 159, which apparently differs from the plan of 1857 in showing the division of the land into lots. The reference to these plans was a part of the printed form of bond used for Back Bay lots generally. In case of the other three lots (not including however either of the two here in question) the second of the above plans was not referred to, and the plan showing the square here in question laid out as provided in St. 1861, c. 183, was referred to as well as the plan of 1857.

In the deeds of sixteen of the lots on Boylston Street the only plan referred to is the plan of 1857; in the other six the other plan set forth in this opinion also is referred to, showing the square in question laid out as provided by St. 1861, c. 183. In the case of Newbury Street the deeds of twelve lots refer to the 1857 plan only, while both plans printed with this opinion are referred to in the deeds of the other ten lots, including the lots now owned by the plaintiffs.

All the forty-six surrounding lots now are built upon. The buildings on Boylston Street are occupied " by the Young Men's Christian Association and for sundry mercantile uses, by the Hotel Brunswick, and by four dwelling houses used for residences"; the lots on Clarendon Street by apartment houses, the one on Boylston Street having "stores beneath"; those on Berkeley Street by a private apartment house and by an apartment and mercantile building; and those on Newbury Street as follows: corner of Newbury and Berkeley Streets, by a church; the next seven, by dwelling houses used as residences; the next, by a club house; the next, number 85, by a doctor's office and lodging house (which the owner "intends within a few months to occupy . . . again for a residence as well as for his office, as formerly"); the next, by a lodging house; the next five, by residences (in the last of which the owner also "carries on her business as a dressmaker and lets rooms for doctors' offices"); the next, by a lodging house; and on the other corner is the rectory of Trinity Church.

The report of the joint standing committee on education, of the Legislature of 1861, referred to above is as follows:

" The joint Standing Committee on Education to whom was referred the memorial of the Associated Institutions of Science & Arts asking for a Charter for the Massachusetts Institute of Technology, & petitioning for a grant of Back-bay lands in a continuous space, for the uses respectively of said Institute, of the Boston Society of Natural History, & of the Massachusetts Horticultural Society, have considered the same, & respectfully Report as follows:

" The memorialists, representing various associations devoted to Manufactures, the Mechanic Arts, Commerce, Agriculture, Natural Science & Public Education, have had repeated hearings before the Committee, in which they have presented orally & by printed documents a full & comprehensive account of the objects & plans of the before-mentioned institutions as bearing on the material & educational interests of the Commonwealth & have submitted a variety of evidence to illustrate the effect of the proposed grant in augmenting the value of the adjacent lands.

" Looking to all these considerations the memorialists urge that the Institutions in question are doubly entitled to the Legislative co-operation; first from the great benefits which they are calculated to confer on the education & industry of the State & secondly from the circumstance that these valuable results will be secured either wholly without charge upon the treasury of the Commonwealth or by an expenditure quite insignificant in comparison with the benefits attained.

" As regards the petition for a Charter for the Mass: Institute of Technology empowering it to carry into effect the plan of a Society of Arts, a Museum of Arts & a School of Industrial Science, your committee believe the objects of the Institute to be of the highest moment to the material & educational progress of the State, & are moreover satisfied of the sincere purpose & ability of those concerned in the enterprise to carry it into successful operation.   They therefore recommend that the Charter prayed for be granted.

" In relation to the assignment of Back-bay lands for which the Memorialists pray, your committee would state that the

petitioners referring to the plan of the territory adopted by the commissioners in 1857 ask the State to set apart and assign to the use of the Boston Soc: of Natural History & the Mass: Institute of Technology the first section of land lying west of Berkeley & between Newbury & Boylston streets extending to Clarendon street, the former Society to occupy about one third & the latter the remaining two thirds of this section. They further ask that the next section of land lying west of Clarendon street in the same range be set apart for the use of the Horticultural Society for ornamental planting & for the erection hereafter of structures suited to the wants of the Society & to the decoration of the grounds.

"Your committee need not enter into details relating to the organization, objects & future purposes of these several institutions; especially as the printed documents prepared with the view of giving full information on these subjects have been for some time in the hands of the Legislature. Restricting ourselves to a few prominent statements in this connection, we would briefly mention certain facts & views which the memorialists urge as entitling these societies respectively to the countenance & assistance of the State.

"Referring first to the Boston Society of Natural History, it appears that this Institution now in existence more than thirty years, has been greatly instrumental in creating & extending a taste for scientific studies & researches throughout the community, that it has made valuable contributions to natural science especially as regards the Geology & Natural History of the State, that it is yearly furnishing additions of acknowledged value to scientific literature by its published journal & proceedings, that it has accumulated a rich & varied collection of objects from the mineral & organic worlds & a library of more than 5000 volumes embracing works of great value for scientific reference & that its museum freely opened to the public once a week is largely visited by teachers & their schools & is recognized as an important means of general instruction. Your committee are further informed that in these efforts to advance the natural sciences & the cause of popular education the Society, with the exception of a grant of 1500 dollars spread over five years, has never asked or received pecuniary aid from the State, but has

been dependent wholly on the enthusiasm of its members & the occasional munificence of individuals.

" The memorialists represent in behalf of this Society that the present building in Mason street is quite too small for their rapidly increasing collections, besides being otherwise unfit for the purposes for which it is used, & they urge that by the erection of an ample structure specially adapted for their objects they will be able to make their labours & instructions more extensively useful to the public at the same time that they secure for themselves a more efficient equipment for those researches by which they may enlarge the boundaries of knowledge. It is moreover represented as a part of their plan, in the event of the success of their present petition, to carry out a system of lectures provided for in their constitution, so as to offer to teachers of the common schools & others seeking such knowledge stated instructions in subjects connected with Natural History.

" In reference to the Institute of Technology your committee have been furnished with full information through the oral statements of the Memorialists & the printed documents already alluded to, in which are set forth the objects & plan of the Institute & the history of the steps thus far taken in its organization.

" As regards the public benefits to be anticipated from it, the Memorialists represent, that such an Institution in its threefold character of a Society of Arts, a Museum of Arts & a School of Industrial Science would be largely conducive to the progress of the Industrial arts & sciences throughout the Commonwealth, & while thus adding to the material wealth of the State, would form a supplement to our educational system of great importance in its influence upon the intelligence & morality of the Community & especially of the industrial classes.

" They urge that in the existing competitions of manufacturing, commercial, & agricultural pursuits such a special training in practical science has become indispensable if we would hope to maintain a prosperous career amid the busy enterprises & inventions of the leading European nations.

" They cite in favour of the plan the example of England, France, & other states eminent for their progress in industry

& applied science, & argue from the general spread of elemen-. tary knowledge among ourselves & from the peculiarly practical genius of our people, that we are most favourably placed for reaping the advantages of such an Institution & for deriving the richest profits from its teachings as applied in the fields of commerce & the arts.

" Looking to the educational bearings of their plan the memorialists urge the great value to the public of each of the three departments of the Institute. They represent that the Society of Arts will be the means of evolving and stimulating the already skilled & cultivated practical talent of the State ; that the Museum of Arts will offer a large treasure of knowledge for the instruction of the general public & for the guidance of all who are devoted to practical science & industrial pursuits, & that the School of Industrial Science while providing a systematic training in the applied sciences & arts of design for its regular students, will open the instructions of ample lecture rooms to the large class of Artisans, Merchants & others seek-. ing for such teachings in practical science as they can acquire in the intervals of labour & without methodical study. In this. connection they dwell particularly on the fact that the Institute will fill an important gap in the present educational plans of the Commonwealth, by supplying the industrial classes with the knowledge & training of which they are specially in need & which could not be effectually provided in any of the existing institutions of the State.

" They also urge that the facilities for the acquisition of practical science thus provided by the Institute being of a nature to attract large numbers of teachers to the museums & lecture-rooms, will conduce to more thorough practical teaching in the common schools, & they add that it is proposed to have a certain number of lectures every year specially arranged for the benefit of persons of this class.

" In evidence of its connection with the industrial and educational progress of the State at large, the Memorialists further represent that, the Institute as thus far organized embraces in its list of more than two hundred members persons from different sections of the Commonwealth & belonging to almost all the active & professional pursuits ; & they state that it is

contemplated in the plan of the Institute to encourage the formation of local Societies of Arts in the different towns of the Commonwealth, whose correspondence & interchange with the central Institution in Boston may carry the working activities of the latter into every part of the State at the same time that they help to enrich its museums & add to the practical efficiency of all its departments.

"In regard to that portion of the petition of the memorialists which relates to the application of the Horticultural Society for the adjoining westerly Square, the Committee unanimously came to the conclusion that there was no immediate urgency in their case, & as there is a doubt existing in some minds as to the propriety of making the grant, it was deemed advisable to dismiss this branch of the petition & leave it to future developments for Legislative action should it be desired.

"Your committee have made careful enquiry in relation to the ability & readiness of the several societies to occupy & improve the proposed grant of land & otherwise to carry into effect the purposes professed by them.  They learn that the Boston Soc: of Nat: History has lately received an important addition to its resources, which with its previous means will place it in a condition to erect a commodious & handsome edifice for its accommodation on the grounds in question, & that the Society will be in readiness to begin building as soon as it shall be authorized to occupy the land.

"In regard to the Institute of Technology the Memorialists represent that it is proposed by this Society, as a guarantee to the State, to agree to raise a sum of 100,000 dollars for their appropriate purposes before entering on the granted land.  They further state that they have already received earnest intimations, conditional on this grant, of a munificent endowment to be devoted to the school of Industrial Science, & of a liberal appropriation from a different quarter for building purposes; and they express the fullest confidence in their ability to secure adequate means for entering effectively on the educational & other plans of the Institute.

"After a full consideration of what is above briefly reported as to the character & prospective influence of the several institutions represented in the memorial & as to their ability to carry

out the purposes professed by them, your committee have been satisfied of the substantial basis of their plans & of the great benefits to be conferred by them on the industry & education of the Commonwealth.

" Before however making up a conclusive opinion on the petition of the Memorialists they have felt it their duty to enquire carefully into the hearing of the proposed grant in a financial point of view, & have sought to ascertain to what extent, if any, this grant would operate to diminish the receipts otherwise accruing from these lands to the school fund of the State.

" According to the plan of the Memorialists, sufficient space is to be reserved to leave wide openings around the buildings of the societies, while the form of the proposed reservation is such as to make the aggregate of lots fronting its sides equal to the area of the reservation.   Common experience shows that such open ornamental grounds surrounding the buildings, together with the attractive exterior of the latter, could not fail to increase the value of the adjacent lands, & to this extent would reimburse the treasury for the space withdrawn from sale.   As regards the amount of this enhancing influence your committee have been furnished by the Memorialists with a large array of facts derived from the sales of lands on the Back bay & other open parts of the city, going to show that improvements of the kind contemplated have been found in every case not only to hasten the sale & occupation of the adjacent lands, but to add very largely to their market value, making the net proceeds of the adjacent lands in most cases as great or even greater than the value of the total area supposing no such reservation to have been made.   These results moreover have been reinforced by the statements of experienced Architects, Builders & dealers in real estate in Boston, as well as by the testimony of the Superintendents of city lands in Boston & in New York.

" Whatever opinions may be entertained as to the extent of this enhancing influence in the case of the present proposed grant, your committee are unanimous in the conviction that it would reach such an amount as to leave but a slight deficiency in the entire proceeds of the lands if indeed it should not completely cover the value of the reserved tract & thus secure the treasury entirely against loss.

" But your committee are unwilling to rest their conclusions as to the prayer of the petitioners wholly or even chiefly on the ground here presented. They see in the plans & purposes set forth by the memorialists the assurance of great & increasing benefits to the general education as well as the industry of the Community, & regarding such aims as eminently entitled to the favour of the State they believe that the public advantages contemplated in the plans proposed would be wisely purchased even by a share of the direct bounty of the Commonwealth.

" Such however is not the kind of aid craved by the petitioners. The land for the use of which they apply has already indirectly & in part at least been dedicated to public education. They do not propose to withdraw it from this Object, but on the contrary to give it a new & vastly increased value for educational purposes. The character & extent of their plans as well as their formal assurances to this effect show that in carrying out their objects they will bring together *in the service of education* on the proposed grant, a wealth of funds & of all the machinery of practical instruction far exceeding the entire money value of the land, & compared with which the dividend accruing from it to the school fund when applied in the same service would be utterly insignificant.

" In view of these facts & considerations your Committee are in favour of granting the prayer of the Memorialists to the extent & according to the conditions of the following Bill —

<div align="right">

" W. Battles
M. Brimmer
Saml L. Ward
John Q. Hammond
James W. Clark
Samuel Osgood."

</div>

St. 1903, c. 438, provides as follows:

" Section 1. All the proprietary right, title and interest by way of reversion, right of re-entry or otherwise, remaining to the Commonwealth in that tract of land, being the westerly two thirds of the square between Newbury, Boylston, Berkeley and Clarendon streets on the Back Bay in the city of Boston, which the Massachusetts Institute of Technology is authorized by chapter one hundred and eighty-three of the acts of the year

eighteen hundred and sixty-one to hold and improve, is hereby released to the said Massachusetts Institute of Technology, its successors and assigns.

"Section 2. Subject to the rights, if any, of other parties and to the restrictions hereinafter set forth, the Massachusetts Institute of Technology, or its grantees, may erect upon all or any part of said premises, buildings conforming to the building laws of the city of Boston; but no building erected on the above described premises shall be used for a stable or for any mechanical or manufacturing purposes."  [Here follow provisions as to set back and projections.]

The case was argued at the bar in December, 1904, before *Morton, Barker, Hammond, & Loring,* JJ., and afterwards was submitted on briefs to all the justices except *Knowlton,* C. J., who, being a member of the corporation of the Massachusetts Institute of Technology, did not sit in the case.

*John Chipman Gray & E. L. Rand,* for the plaintiffs.

*G. Putnam & W. L. Putnam,* for the defendant.

LORING, J.  The contest here is on the application of well settled principles of law to new surroundings.

Counsel for both parties agree that it is not necessary to decide whether the effect of St. 1861, c. 183, was to convey to the two societies the fee in the square in question or only certain rights of occupation, the fee being retained in the Commonwealth.  If we speak of the grant as one or the other, it will be for convenience only and not as expressing any opinion on this point.

We agree with the counsel for the defendant in their contention that if St. 1861, c. 183, was not intended to give to persons buying the surrounding lots under it the right here claimed by the plaintiffs, they cannot make out a case because of the form given to the transaction by the officers of the Commonwealth. If St. 1861, c. 183, was not intended to give such a right, such acts of these officers would not bind the Commonwealth on the principle lately enforced in *Wormstead* v. *Lynn,* 184 Mass. 425.

In construing this act the first fact and the most important consideration is that the grant to these two societies was not to cost the Commonwealth a penny, and that this was to be

effected by dealing with the square granted to the societies in such a way as so to enhance the value of the surrounding lots that they would yield as much as or more than the aggregate value the two had under the conditions prevailing before St. 1861, c. 183, was enacted. It is perhaps of some interest that this scheme was suggested to the Commonwealth by the petitioners for these grants, including among them the petitioners for the incorporation of the defendant.

It is stated in the report of the committee of the Legislature to whom these petitions for a grant of land were referred: " According to the plan of the Memorialists, sufficient space is to be reserved to leave wide openings around the buildings of the societies." And again: " Common experience shows that such open ornamental grounds surrounding the buildings, together with the attractive exterior of the latter, could not fail to increase the value of the adjacent lands, and to this extent would reimburse the treasury for the space withdrawn from sale. As regards the amount of this enhancing influence your committee have been furnished by the Memorialists with a large array of facts derived from the sales of lands on the Back Bay and other open parts of the city, going to show that improvements of the kind contemplated have been found in every case not only to hasten the sale and occupation of the adjacent lands, but to add very largely to their market value, making the net proceeds of the adjacent lands in most cases as great or even greater than the value of the total area supposing no such reservation to have been made."

St. 1861, c. 183, adopted to carry into effect this scheme of the " memorialists," (including the defendant Institute,) provided (first) that the square in question " shall be reserved from sale forever"; (second) " and kept as an open space, or for the use of " the two societies; and (third) " The above named societies shall not cover with their buildings more than one-third of the area granted to them respectively." The plaintiffs contend that these declarations were addressed to the purchasers of the surrounding lots as the basis on which those lots were to be sold, and were made for the benefit of such purchasers; and that having bought on the faith of them these purchasers are entitled to have them specifically enforced.

The defendant on the contrary insists that on a fair construction of the provisions of the act the Legislature intended to keep and did keep the control of all restrictions in its own hands, that the value of the surrounding lots was to be enhanced by the square in question being physically laid out before they were sold, and that the square was to continue in that condition so long as the Commonwealth, having regard to the interests of all concerned, should think it ought so to continue and no longer ; that St. 1903, c. 438, was an exercise of the control so reserved, and brought to an end as of right the advantages for which the purchasers of the surrounding lots paid an enhanced price.

When the defendant contends that in St. 1861, c. 183, the Legislature kept the control of the whole situation in its own hands, it relies on the fact that, having regard to the words "further conditions" in § 6, what are called "stipulations" in § 4 are really conditions, and being conditions the subject matters covered by them are matters between the Commonwealth and the grantees, and between them alone.

Were that the whole story the result would not necessarily follow.   The fact that a provision in a deed is put in the form of a condition and in no other form, even when coupled with an express statement that the "non-fulfilment or breach . . . shall work a forfeiture of the estate hereby conveyed, and reinvest the same in the grantor," is not decisive against its operating as an equitable restriction in addition to its operating as a common law condition.   That was decided in *Hopkins* v. *Smith,* 162 Mass. 444, and is laid down in the recent case of *Welch* v. *Austin,* 187 Mass. 256, 258.   The same principle would govern in case of a grant made by act of the Legislature.

The doctrine of *Hopkins* v. *Smith* is that in spite of the parties to a deed having put the thing agreed upon in the form of a common law condition and a common law condition only, the question whether it does not operate also as an equitable restriction is one of intention.   The fact that the thing agreed upon has been put in the form of a common law condition, and in that form alone, is of itself a matter to be taken into consideration in arriving at the intention of the parties.   But that fact has no greater or further effect.   The opposite results severally reached in the cases of *Peck* v. *Conway,* 119 Mass. 546, and *Clapp* v.

*Wilder*, 176 Mass. 332, are examples of the application of this rule.

The cases of *Episcopal City Mission* v. *Appleton*, 117 Mass. 326, and *Skinner* v. *Shepard*, 130 Mass. 180, (as to which see *Welch* v. *Austin*, 187 Mass. 256, 259,) would raise an additional difficulty in construing the matters covered by § 4 * to be equitable restrictions as well as conditions, had the plaintiffs put their case on the ground that it was by force of the provisions of that section that they were entitled to an equitable restriction. That additional difficulty consists in the fact that § 4 deals alike with matters with which the purchasers of surrounding lots have nothing to do, and with inclosing, adorning and cultivating the open ground around its building and thereafter keeping said grounds and building in a sightly condition. We refer to the "stipulation" that "persons from all parts of the Commonwealth shall be alike eligible as members of said institute, or as pupils for its instruction ; and its museum or conservatory of arts, at all reasonable times, and under reasonable regulations, shall be open to the public." But as we shall see, § 4 and its provisions are not what the plaintiffs rely upon.

We come then to the question of the true construction of the act, St. 1861, c. 183.

In the first place, it is provided (and this provision is in § 3 and is not one of the " stipulations " of § 4 nor one of the " fur-

---

* " Section 4. If at any time within one year after the passage of this act, the said Institute of Technology shall furnish satisfactory evidence to the governor and council that it is duly organized under the aforesaid charter, and has funds subscribed, or otherwise guaranteed, for the prosecution of its objects, to an amount at least of one hundred thousand dollars, it shall be entitled to a perpetual right to hold, occupy and control, for the purposes herein before mentioned, the westerly portion of said second square, to the extent of two thirds parts thereof, free of rent or charge by the Commonwealth, subject nevertheless, to the following stipulations, namely : persons from all parts of the Commonwealth shall be alike eligible as members of said institute, or as pupils for its instruction; and its museum or conservatory of arts, at all reasonable times, and under reasonable regulations, shall be open to the public ; and within two years from the time when said land is placed at its disposal for occupation, filled and graded, said institute shall erect and complete a building suitable to its said purposes, appropriately inclose, adorn and cultivate the open ground around said building, and shall thereafter keep said grounds and building in a sightly condition."

ther conditions" of § 6) that the square in question "shall be reserved from sale forever."

It is true that the only thing here complained of is a threat by the defendant Institute to build over more than one third of the area granted to it.   But the right to build over more than that area and the right to sell the whole area to others to be built over by them is treated in St. 1861, c. 183, as one and indivisible, and no distinction is made in St. 1903, c. 438, between the right to build over the whole area and the right to sell the whole area to others to be built over by them.   The two rights alike are granted to the defendant Institute by the act of 1903.   The true construction of St. 1861, c. 183, cannot be determined without considering the validity of the provision of St. 1903, c. 438, which permits the sale by the defendant Institute of the whole area to others, to be built over by them.

In construing St. 1861, c. 183, we start first with a declaration that this square was to " be reserved from sale forever." And having in mind the purpose for which St. 1861, c. 183, was enacted, we are of opinion that this was a declaration addressed to future purchasers of surrounding lots, to induce them to pay for those surrounding lots more than they otherwise would pay for them.

We next come to the declaration that the square which is to " be reserved from sale forever" is to be " kept as an open space or for the use of" the two societies, and that " the above named societies shall not cover with their buildings more than one-third of the area granted to them respectively."   These provisions state the details of what is to be done with this square which is to " be reserved from sale forever," and like that declaration are addressed to future purchasers of surrounding lots.   Being details the duration of them is fixed by that of the main provision of which they are details, unless there is something to control that result.

It is of importance that these provisions are not found among the " stipulations" of § 4, nor among the " further conditions" of § 6,* but are in separate sections (§§ 3 and 7) which are not

---

* " Section 6.   The rights and privileges given in the last two sections, are granted subject to these further conditions following, namely: All buildings whatsoever, which may be erected by either of the herein named in-

put directly or indirectly in the form of conditions. The case now before us therefore is not such an extreme one as *Hopkins* v. *Smith*, where there was no provision outside of or in addition to a condition coupled with an express defeasance and right of re-entry.

In the case at bar the broad principles on which the surrounding lots are to be sold are stated in sections (§§ 3 and 7) addressed to the purchasers of them; and these are not put in the form of conditions. In addition we have §§ 4 and 6 which are put in the form of conditions. These sections deal (*inter alia*) with the machinery adopted for carrying into effect the details of the broad principles stated in §§ 3 and 7.

Apparently the Legislature thought that the best results could not be secured to the purchasers of surrounding lots unless some one person or body could act for them all in matters of detail, and for that reason it entrusted the matter of dealing with the details to the Governor and Council. Apparently the Legislature further thought that the best way of enforcing compliance with directions as to details so made was to give to the Governor and Council a right of re-entry on non-compliance with the directions adopted by them; and it gave such a right of re-entry. But that did not interfere with the declarations (on which these surrounding lots were to be sold) constituting a right in the purchasers of them, namely, that this square was to " be reserved from sale forever," and, if not used as an open space, it was not to be covered by buildings to an extent greater than one third of its area. The result is that the design of the buildings to be erected, the laying out of the grounds and the proper main-

---

stitutions upon any portion of said second square, shall be designed and completed, the grounds surrounding said buildings inclosed, laid out and ornamented, and the said buildings and grounds kept and maintained in a manner satisfactory to the governor and council; and in case either of the said institutions shall, after due notice given, neglect to comply with the requirements of this section, or fail to use its portion of said square, or at any time appropriate said portion, or any part thereof, to any purpose or use foreign to its legitimate objects, then the right of said delinquent institution ·to the use, occupation or control of its portion of said square shall cease, and the Commonwealth, by its proper officers and agents, shall have the right forthwith to enter and take possession of the portion of land so forfeited."

tenance of both are matters left to the discretion of the Governor and Council. But the broad principles were not left to them. Under St. 1861, c. 183, the Governor and Council were authorized to approve such a building as they saw fit without regard to what might be thought of it by others; they might give their approval to what might be thought by others to be the laying out of the grounds in a way injurious to the surrounding residences, and they might allow the grounds to fall into what might be thought by others to be a deleterious state of maintenance. On these matters of detail their decision, honestly exercised, is final. But they have not now and never had jurisdiction to abridge the rights of the purchasers of surrounding lots (first) to have the square "reserved from sale forever," and, (second,) in case it is not used as an open space, to have the buildings of the two societies not cover "more than one-third of the area granted to them respectively." In our opinion such was the intention of the Legislature in enacting St. 1861, c. 183, and that is what the Legislature provided by that act.

It is true that St. 1863, c. 226, repealed §§ 8 and 9 of St. 1861, c. 183, requiring the two societies to make good the deficit in case the amount realized from the sale of the surrounding lots under St. 1861, c. 183, did not equal the value of those lots plus the value of the square here in question before St. 1861, c. 183, was enacted; and that all the lots (with the exception of those on Berkeley Street sold before the enactment of St. 1861, c. 183) were sold after the repealing act of 1863. But the repeal of these sections was not intended to change the scope of the act (St. 1861, c. 183). It was intended to release the societies from a burden which was assumed and rightly assumed to have ceased to exist. As was said by the commissioners in their report of 1863, when speaking of the sales made in the previous year, the "policy of this repeal was justified by the sale" on account of the great rise above the appraised values, — a rise which was created by the scheme of St. 1861, c. 183, in favor of the surrounding lots.

We are of opinion that on the facts stated the plaintiffs have sustained the burden of proving that the surrounding lots generally and the lots now owned by them in particular, were sold and bought under St. 1861, c. 183; and that they became en-

titled by such purchase to the benefits granted to them by that act, including the right to have the buildings of the defendant corporation confined to an area not exceeding one third of the land assigned to it by St. 1861, c. 183.

Although the Commonwealth is a sovereign State, it can no more change the grant thus made than can an individual. That has been the law, at least since *Dartmouth College* v. *Woodward*, 4 Wheat. 518.

We see nothing in the agreement of the parties * that should disentitle the plaintiffs from having this agreement specifically enforced.. What that agreement amounts to is that the square in question would have a greater market value than it has if the surrounding lots had not been sold on the terms on which they were sold. The plaintiffs have a right to use their property as they please, even if that property would have a greater value if devoted to another use. The facts agreed to do not bring the case within the doctrine of *Jackson* v. *Stevenson*, 156 Mass. 496,

---

* The agreement referred to is contained in the following paragraphs of the agreed facts :

"15. The value of the neighboring land on Boylston street has, since 1861, multiplied several times. The market value of the westerly two thirds of the square in question, if it could be covered and improved by buildings conforming to the restrictive provisions imposed by acts of 1903, c. 438, would be many hundred thousand dollars more than its market value if only one third of its area can be legally covered by buildings.

"16. The defendant contends that the market value of the plaintiff's land would be increased by such erection. This the plaintiff denies, and claims its value would be decreased thereby. It is agreed, however, that the erection of such buildings would cause appreciable damage to the plaintiff's building as a dwelling house, the purpose for which it was designed and is still used; but that the defendant might put certain structures on certain parts of the two thirds of its land now unused without other damage to the plaintiff than such technical damage as the law would imply.

"17. The Institute of Technology has outgrown its present quarters and must add to them by either building in the neighborhood, by building on the unused two thirds of its part of the square, or by moving to cheaper land in the suburbs. It has not at present means sufficient to buy land in the neighborhood and maintain its efficiency. It cannot afford to move unless it can sell the whole of its two thirds of the square for improvement, or obtain additional gifts. Its present buildings on the square cost upwards of $500,000, and at least one of them, the Walker building, is not adapted for other purposes than those of a scientific school, and both would be useless for the purposes of the Institute if it moved into the suburbs."

nor within the concluding paragraph of the opinion in *Parker* v. *Nightingale*, 6 Allen, 341, 349.

The plaintiffs are severally entitled to a decree with costs enjoining the defendant from proceeding with the erection of any building or buildings covering more than one third of the area assigned to it by St. 1861, c. 183.

<div align="right">*So ordered.*</div>

Justices MORTON and HAMMOND dissent. They think that the square occupied in part by the defendant is not subject to any equitable or other restrictions in favor of the plaintiffs or surrounding lot owners, and that the bills should be dismissed.