MASSACHUSETTS INSTITUTE OF TECHNOLOGY *vs.* BOSTON SOCIETY
OF NATURAL HISTORY & others.

SAME *vs.* SAME.

Suffolk.   March 25, 1914. — May 25, 1914.

Present: HAMMOND, BRALEY, SHELDON, DE COURCY, & CROSBY, JJ.

*Equitable Restrictions. Massachusetts Institute of Technology. Boston Society of
Natural History. Words,* "Reserved from sale forever," "Condition."

The effect of the passage of St. 1861, c. 183, §§ 3, 4, 6, 7 and of the sales thereafter
made by the Commonwealth of lots of land on Boylston, Clarendon and New-
bury Streets in Boston facing the land held by the Massachusetts Institute of
Technology under § 4 of that statute, was to create equitable restrictions for
the benefit of the subsequent purchasers of those lots, subject to which the
Commonwealth by St. 1903, c. 438, released to the Massachusetts Institute of
Technology all rights which had been retained by the Commonwealth in the
land held by that corporation under St. 1861, c. 183.   Following *Wilson* v.
*Massachusetts Institute of Technology,* 188 Mass. 565.

In the equitable restriction imposed by § 3 of St. 1861, c. 183, on the land designated
for the use of the Massachusetts Institute of Technology, that it "shall be
reserved from sale forever, and kept as an open space, or for the use of such
educational institutions" as afterwards are mentioned, meaning as to two thirds
of the tract of land described the Massachusetts Institute of Technology, it
was not intended to prohibit the passing of a bare legal title, but to require
that the land, if not used for the educational purposes of the corporation, should
be kept as an open space.

The equitable restriction imposed by § 7 of St. 1861, c. 183, on the land designated
for the use of the Massachusetts Institute of Technology, that the corporation
shall not cover with its buildings more than one third of the area granted to it,
does not require that the location of its buildings when once fixed to the satis-
faction of the Governor and Council shall not be changed.

The equitable restrictions imposed by certain sections of St. 1861, c. 183, on the
land designated for the use of the Massachusetts Institute of Technology were
not imposed for the benefit of the Boston Society of Natural History, which
was granted the use of adjoining land by § 5 of the same statute.

The land of the Massachusetts Institute of Technology abutting on Boylston,
Clarendon and Newbury Streets in Boston is subject to equitable restrictions,
in favor of the owners of lots on those streets opposite the open rectangle of
land of which that corporation was granted the use of two thirds, that such
two thirds of the rectangle shall forever be kept as an open space or for the use
of the corporation for its educational and scientific purposes, and that, if and
while so used, the corporation shall not cover with its buildings more than
one third part of the area of the land designated for its use.

PETITION, filed in the Land Court on February 8, 1912, by
the Massachusetts Institute of Technology, incorporated by St.

1861, c. 183, against the Boston Society of Natural History, incorporated by St. 1830, c. 56, amended by St. 1861, c. 183, § 5, and others, for the registration of the title of the petitioner to the westerly two thirds portion of the rectangular tract of land in Boston bounded by Berkeley, Newbury, Clarendon and Boylston Streets, held by the petitioner under St. 1861, c. 183, and St. 1903, c. 438; and also a

PETITION, filed in the Land Court on April 17, 1913, by the same corporation under R. L. c. 182, §§ 11–14, as amended by St. 1904, c. 448, against the same respondents to determine the validity, nature and extent of certain alleged easements claimed in the land of the petitioner described in the first petition.

In the Land Court the cases were tried together before *Davis,* J., who at the request of the various parties reported them for determination by this court. A statement of the facts on which the decision of this court in *Wilson* v. *Massachusetts Institute of Technology,* 188 Mass. 565, was based, taken from the opinion of the court, will be found on pages 566–579 of 188 Mass.

*J. B. Warner,* (*R. W. Hill* with him,) for the petitioner.

*John Chipman Gray & Roland Gray,* for the respondent H. W. Suter and others.

*H. M. Davis,* (*C. S. Rackemann* with him,) for the respondent Lorin F. Deland.

*H. Wheeler,* for the respondent Trinity Church.

*E. H. Talbot,* for the respondent George R. White and others, submitted a brief.

SHELDON, J. We regard it as settled by the decision of this court in *Wilson* v. *Massachusetts Institute of Technology,* 188 Mass. 565, that the effect of the passage of St. 1861, c. 183, and of the sales thereafter made by the Commonwealth of the lots of land upon Boylston, Clarendon and Newbury Streets facing the square described in that act, was to create equitable easements or restrictions upon the land included in that square for the benefit of the subsequent purchasers of those lots. As to some of those lots, and as to one of those equitable easements or restrictions, it is conceded that the question has been concluded by the decision in the Wilson case. We need not consider what further effect, if any, should be given to that decision as an adjudication; for we are satisfied with the reasoning of the opinion

·which was rendered therein. The result reached, in our opinion, was in accord with the great weight of authority both in this Commonwealth and in other jurisdictions. We refer to some of the cases not cited in that opinion. *Schwoerer* v. *Boylston Market Association,* 99 Mass. 285, 297, 298. *Beals* v. *Case,* 138 Mass. 138, 140. *Codman* v. *Bradley,* 201 Mass. 361. *Childs* v. *Boston & Maine Railroad,* 213 Mass. 91. *Pierce* v. *Roberts,* 57 Conn. 31. *Hills* v. *Miller,* 3 Paige, 254. *Lennig* v. *Ocean City Association,* 14 Stew. 606. *Bridgewater* v. *Ocean City Railroad,* 17 Dick. 276. *Rowan* v. *Portland,* 8 B. Mon. 232. *Alderson* v. *Cutting,* 163 Cal. 503. *Rankin* v. *Huskisson,* 4 Sim. 13. *McLean* v. *McKay,* L. R. 5 P. C. 327. *In re Birmingham & District Land Co.* [1893] 1 Ch. 342. *Rowell* v. *Satchell,* [1903] 2 Ch. 212.

The act of 1861, as was pointed out in the Wilson case, operated not only as a statute strictly so called, but also as a legislative grant and declaration, like a declaration of trust, for the establishment of stated rights in those who should become the owners of the forty-six lots facing upon the square. *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.* 104 Mass. 446, 448. *Attorney General* v. *Gardiner,* 117 Mass. 492, 499. *Bradford* v. *McQuesten,* 182 Mass. 80. *Wisconsin Central Railroad* v. *Forsythe,* 159 U. S. 46, 55. As such, it became binding in favor of the purchasers of those lots when, acting, as it must be assumed (*Beals* v. *Case,* 138 Mass. 138, 142), and indeed as it appears that they did, on the faith of this declaration by the Commonwealth and paying an increased price by reason thereof, they made their purchases. As to them, the Commonwealth became bound in equity by reason of its grant or declaration, just as a private person would have been. *Commonwealth* v. *Proprietors of New Bedford Bridge,* 2 Gray, 339, 350. *Boston* v. *Richardson,* 13 Allen, 146, 156. *Boston Molasses Co.* v. *Commonwealth,* 193 Mass. 387, 389. The act did not attempt to bargain away or to infringe upon the future exercise of any sovereign rights, and cases which deal with such a state of facts have no application here. See for example *Newton* v. *Commissioners,* 100 U. S. 548; *Fox* v. *Cincinnati,* 104 U. S. 783; *Vicksburg, Shreveport & Pacific Railroad* v. *Dennis,* 116 U. S. 665; *Wisconsin & Michigan Railway* v. *Powers,* 191 U. S. 379.

It is manifest also that this act was intended to create per-

manent restrictions and not merely temporary ones, and this makes immaterial other cases relied on by the petitioner, such as *Hubbell* v. *Warren*, 8 Allen, 173; *Boston Baptist Social Union* v. *Boston University*, 183 Mass. 202; and *Welch* v. *Austin*, 187 Mass. 256. Since the act itself operates as a grant or a declaration of trust, it was not a merely verbal statement or one of which sufficient notice was not brought home to the parties, and other cases relied on by the petitioner are inapplicable, such as *Sprague* v. *Kimball*, 213 Mass. 380, and *Renals* v. *Cowlishaw*, 9 Ch. D. 125. There was a general scheme here for the development of the surrounding land, and this excludes such cases as *Wille* v. *St. John*, [1910] 1 Ch. 325. But we need not consider all the specific objections that have been suggested. We have weighed carefully all the contentions made in behalf of the petitioner, and have examined all the decisions to which we have been referred, as if the question were a new one. We are still content to adopt the reasoning of the Wilson case, *ubi supra*, and to follow it as an authority.

But it is said that this ought not to be done, because, by consent of the parties in the Wilson case, incompetent evidence there was considered. We are not prepared to say that all of this evidence was incompetent for all purposes. It doubtless is true that the rights of the owners of these lots depend upon the intention of the Legislature as displayed in the statute itself. *Commonwealth* v. *Fitchburg Railroad*, 8 Cush. 240. *Boston & Providence Railroad* v. *Midland Railroad*, 1 Gray, 340. *Boston* v. *Talbot*, 206 Mass. 82. *North British Railway* v. *Tod*, 12 Cl. & Fin. 722. But this act operated, not only as a statute, but as an instrument creating rights in others; and it is competent to show the circumstances as they then existed. *Browne* v. *Turner*, 174 Mass. 150, 159. *Old South Association* v. *Boston*, 212 Mass. 299, 304. *Rea* v. *Aldermen of Everett*, 217 Mass. 427. See also *Beals* v. *Case*, 138 Mass. 138; *Commonwealth* v. *Dow*, 217 Mass. 473; *Church of the Holy Trinity* v. *United States*, 143 U. S. 457, 462, *et seq.* The plans, deeds, catalogues of sales, etc., were not admissible to show the intention of the Legislature in the passage of the act. They could have no further effect than to identify the persons who became entitled to the benefit of the restrictions. The petitioner asked for a ruling to this effect, and it was given. The rul-

ings made on this point by the judge of the Land Court were sufficiently favorable to the petitioner.

Nor does it appear that the decision in the Wilson case was made upon incompetent evidence.  The court expressly declared that the existence of the restrictions depended upon the intention shown by the act, and that if such an intention was not found in the act itself, the restrictions could not arise from what later was done by the officers of the Commonwealth.

One of the restrictions was that the square should be "reserved from sale forever."  And this was recognized in the Wilson case (page 583) as being one of the restrictions to which the petitioner's land was subjected.  But its effect was not considered, and now must be determined.

It is true that this restriction would be invalid if made by an individual.  It is not so clear that the Commonwealth, acting both as an owner of land and in its sovereign capacity, could not create such a restriction.  *Smythe* v. *Henry*, 41 Fed. Rep. 705. But this restriction must be taken in connection with all the other provisions of the act in which it is found, and construed so as to carry out the evident intent of the Legislature rather than by a close adherence to its exact words.  The provision is not barely that the land shall be reserved from sale forever, but that it shall be so reserved and "kept as an open space, or for the use of such educational institutions" as are afterwards mentioned. The manifest intention was to prohibit any sale which should interfere with the main object of the act, the object which the subsequent purchasers of the other lots were to pay for, that the square should be kept as an open space or used solely in the other manner stated.  It was not intended to prohibit the passing of a bare legal title, but only such a sale as should avoid or endanger the main purpose which was declared.   This was the construction adopted in *McLean* v. *McKay*, L. R. 5 P. C. 327.  That bare legal title, so far as it still was held by the Commonwealth, has been released to the petitioner by St. 1903, c. 438, but subject to the legal rights of all other parties and to certain additional restrictions. We are of opinion accordingly that the land is not now subject to the restriction that the mere legal title shall not be sold or transferred, but only to the other restrictions created by St. 1861, c. 183.

The first one of these restrictions is in the alternative, that the land shall be kept as an open space or for the use of such educational institutions as are mentioned. And in view of the other provisions of the statute and of what has been done and the rights which have been acquired thereunder, we are of opinion that these educational institutions can be only the petitioner as to the westerly two third parts of the land. It follows that the petitioner's land, if not used for its educational purposes, is subject to the restriction that it must be kept as an open space. If it shall continue so to be used by the petitioner, it is subject to the further restriction that the petitioner shall not cover with its buildings more than one third of the area of the land.

The respondents contend further that the present location of the buildings upon this land cannot be changed. The design and construction of these buildings and the arrangement of the grounds were subject to the approval of the Governor and Council, and their approval has been given. The Governor and Council acted in this matter according to their own discretion, but without the power to abridge the right of the lot owners either to have the land kept as an open space or (if used by the petitioner in the manner permitted) to have the land covered by buildings only as to one third of its area. *Wilson* v. *Massachusetts Institute of Technology*, 188 Mass. pp. 584, 585. The respondents contend that this location of the buildings is like the location of an undefined way, which, when once duly fixed, is not to be changed at the mere will of one party; and there is force in the argument.

But this is not an easement under which something is to be done by the owners of the dominant estates upon the land of the petitioner. It is a limitation, in favor of those other estates, upon the power of the petitioner to put to a beneficial use a portion of its land, not including any particular and specified part thereof, but defined only by its amount. The petitioner is allowed to occupy with buildings only one third of the area of its land; two thirds thereof must remain open. There is no question that in the first instance (subject to whatever control was given to the Governor and Council) it was for the petitioner, acting in good faith, to select the ground upon which it should build. To say that this selection once made must be forever after binding would be to add to the restriction by judicial interpretation something which the

Legislature did not see fit to add. It would be to make the restriction more onerous than in terms it was made by the instrument which created it. But a restriction like this always is to be construed with some strictness, and not extended beyond the natural meaning of the words used in its creation. *American Unitarian Association* v. *Minot,* 185 Mass. 589, 595, and cases there cited. The words must not be so construed as to enlarge by inference or implication the restrictions imposed.

The requirement of § 4 of St. 1861, c. 183, that the petitioner should within a stated time "erect and complete a building suitable for its said purposes, appropriately inclose, adorn and cultivate the open ground around said building, and shall thereafter keep said grounds and building in a sightly condition," tends to support our view. It manifestly was not required or contemplated that this building should occupy the whole third part of the area, upon which the petitioner could erect buildings. The provisions of § 6 show that it was intended to give to the petitioner the privilege of erecting additional buildings, of course within the limitation fixed by § 7 of the act. When such additional buildings or increased accommodation should be required for the proper purposes of the petitioner, how can we say that the building already erected in compliance with the requirement of § 4 might not be taken down, and either new buildings in convenient locations or one larger building, covering the whole allowed space, be put up, though the location of the original building were left in this way as an open space? But if we cannot say this, and if the location of one building at least was not fixed forever by the selection once made of its site, we have no right to extend the restriction actually imposed by saying that the location of any other buildings should be less revocable and less subject to change than that of the one first erected in compliance with the terms of the act.

The other provisions of the act point in the same direction. Its language was very carefully chosen. The provision for the design and construction of the buildings to be erected by the petitioner is not expressed in words like those which created the restrictions that heretofore have been considered. The requirements now spoken of are stated as conditions, and are to be enforced, not by equitable remedies, but by the creation of a right of re-entry by the Commonwealth, a right which would

or would not be exercised by the Commonwealth according to its own discretion, and which now has been released to the petitioner by St. 1903, c. 438. It is not that the word "condition" could not be used to create an equitable easement or restriction, if such was the intention manifested. We have a very careful and exact use of language, apt as to other provisions to create restrictions, but here expressly providing for conditions, with the appropriate remedy for a breach thereof. The creation of restrictions under a scheme for the development of land depends always upon the intent shown by the language used as applied to the existing circumstances. *Hartman* v. *Wells,* 257 Ill. 167. It does not appear to have been the intention of the Legislature to restrict the right of the petitioner, while it continued to occupy the land, by the requirement in favor of the adjoining lot owners that the location of its buildings, once fixed to the satisfaction of the Governor and Council, should not afterwards be changed.

If it appeared, which we do not decide, that the circumstances of this neighborhood had become so changed, that the restrictions upon this land ought not to be enforced specifically, yet that would not deprive them of existence, but would merely make them the subject of pecuniary compensation. See *Jackson* v. *Stevenson,* 156 Mass. 496; *American Unitarian Association* v. *Minot,* 185 Mass. 589; *Welch* v. *Austin,* 187 Mass. 256, 261.

We are not impressed by the argument of the petitioner that equitable easements or restrictions were not introduced into our law until the decision in 1863 of *Parker* v. *Nightingale,* 6 Allen, 341, and that therefore their creation in 1861 could not have been intended by the Legislature. *Hamlen* v. *Keith,* 171 Mass. 77. The reasoning of the opinion in *Whitney* v. *Union Railway,* 11 Gray, 359, decided in January, 1860, is against the proposition. And in *Parker* v. *Nightingale, ubi supra,* the doctrine in question was applied to a conveyance made in 1822. The decision in *Wilson* v. *Massachusetts Institute of Technology,* 188 Mass. 565, is decisive against this contention of the petitioner.

These restrictions appear to have been intended for the benefit of the owners of the lots abutting on Boylston, Clarendon and Newbury Streets and facing the square in question. They were not intended for the benefit of the lots fronting on Berkeley Street, which had been sold before the passage of the act. It is

settled that they created no restrictions in favor of that portion of the square which was assigned to the Boston Society of Natural History. *Boston Society of Natural History* v. *Massachusetts Institute of Technology,* decided without opinion on January 1, 1906.*  And we find no intention shown in the act that it should operate for the benefit of any lots, however near to the square, not actually opposite to some part of it.  The scope of the act is limited in this way; and there is no rule of law which can prevent us from giving effect to the intent thus shown. *Boston Water Power Co.* v. *Boston,* 127 Mass. 374. *Coolidge* v. *Dexter,* 129 Mass. 167, 169. *Williams* v. *Boston Water Power Co.* 134 Mass. 406. *Regan* v. *Boston Gas Light Co.* 137 Mass. 37. *Pearson* v. *Allen,* 151 Mass. 79.  It follows that the rectory lot so called of Trinity Church is, but that the chapel lot so called, is not, entitled to the benefit of the restrictions.

It is not necessary to discuss in detail the different exceptions taken by the respective parties in the Land Court.  So far as material, they are sufficiently covered by what has been said.

The result is that in the second case a decree is to be entered that the petitioner's estate is subject to the equitable easements or restrictions, in favor of the owners of the lots abutting on Boylston, Clarendon and Newbury Streets and opposite to the square in question, that it shall forever be kept as an open space or for the use of the petitioner for its educational and scientific purposes, and if and while so used that the petitioner shall not cover with its buildings more than one third part of the area of its land.

In the first case, a decree is to be entered for the registration of the petitioner's title subject to the incumbrances above stated.

*So ordered.*

---

* The rescript declared that a majority of the court were of opinion that the restrictions upon the defendant's land were not imposed for the benefit of the plaintiff.