JOHN J. WILSON, TRUSTEE, APPELLANT, V. NEBRASKA STATE BANK, APPELLEE.

FILED FEBRUARY 16, 1934. No. 28620.

Burkett, Wilson, Brown, Wilson & Van Kirk and George E. Hager, for appellant.

Beghtol & Foe and J. Lee Rankin, contra.

Heard before Goss, C. J., Rose and Paine, JJ., and Begley and Horth, District Judges.

Horth, District Judge.

On March 29, 1928, an involuntary petition in bankruptcy was filed in the district court of the United States for the district of Nebraska, Lincoln division, against the Lincoln Box and Manufacturing Company, hereinafter called the company, and on April 19, 1928, the company was adjudged a bankrupt, and by this action the trustee of the bankrupt estate, hereinafter called the plaintiff, seeks to recover from the Nebraska State Bank of Lincoln, Ne-

braska, hereinafter called the defendant, the sum of $9,745.93, with interest thereon, which amount the defendant on February 21, 1928, charged to the checking account of the company and credited on the $16,250 demand note of the company owned by defendant; plaintiff asserting that the defendant thereby received a preference in payment over other creditors of the same class of the bankrupt, under the provisions of the bankruptcy laws of the United States. The defendant answering, admitted the filing of the petition in bankruptcy against the company, that the company was adjudged a bankrupt, and that plaintiff was elected and appointed trustee of the bankrupt estate; denied all other allegations of plaintiff's petition; and as an affirmative defense pleaded the right to set off the amount of the company's deposit against the company's note owned by it.

The cause came on for trial in the district court and, when all the evidence had been presented, each party moved for an instructed verdict. The trial court discharged the jury, found that the act of the defendant in setting off the company's deposit against the note owing to the defendant by the company did not constitute a preference under the bankruptcy law, and further found, generally, in favor of the defendant and dismissed plaintiff's petition. Plaintiff's motion for a new trial having been overruled, plaintiff appeals, urging that the trial court erred in refusing to enter judgment in favor of the plaintiff and in dismissing plaintiff's action.

It appears from the evidence that for several years prior to February 20, 1928, the company had been engaged in a general woodwork and box manufacturing business in the city of Lincoln, owning its own factory building, the machinery necessary for the conduct of its business, and the grounds occupied by the factory building; that during all of said years the company had borrowed money from and had maintained a checking account with the defendant; that on February 20, 1928, the company, with the knowledge, advice and approval of the managing officers

of the defendant, sold its real estate together with the factory building situated thereon and a portion of its machinery for the sum of $9,908.04, and deposited the check representing the sale price in its checking account with the defendant; stored the unsold portion of its machinery and ceased to do any manufacturing business. In the morning of February 21, 1928, the defendant charged the company's checking account with the sum of $9,745.93 and credited said amount on the $16,250 demand note of the company.

Two major questions present themselves for determination, namely: (1) Did the defendant, under the facts in this case, have the right of set-off under the provisions of section 68 of the United States bankruptcy act; and (2) did the defendant receive a preference over other creditors of the same class, voidable at the instance of the plaintiff, under the provisions of sections 60a and 60b of said bankruptcy act?

1. Section 68 of the United States bankruptcy act provides:

"a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

"b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate; or (2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent, or had committed an act of bankruptcy." 30 U. S. St. at Large, ch. 541, p. 565.

In 1904 the supreme court of the United States, in interpreting section 68a of the bankruptcy act, in *New York County Nat. Bank v. Massey*, 48 L. Ed. 380 (192 U. S. 138) said:

"Insolvents, by depositing money in a bank upon an open account, subject to check, do not thereby make a

transfer of property amounting to a preference, which, under the bankruptcy act of 1898 (30 Stat. at L. 562, U. S. Comp. Stat. 1901, p. 3445), sec. 60a, will deprive the bank of its right under section 68a to set off the amount of such deposit remaining to the depositors' credit on the date of their adjudication in bankruptcy and to prove its claim against the bankrupt estate for the balance."

In 1913 the court again had the question under consideration in *Studley v. Boylston Nat. Bank,* 57 L. Ed. 1313 (229 U. S. 523) and the court there said:

"The enforcement by a bank of its lien or right of set-off by applying deposits, honestly made *in due course of business,* and without intent to prefer the bank, to the payment of the depositor's notes in the bank's favor as they matured, does not, though within four months of the bankruptcy proceedings against such depositor, constitute a preference forbidden by the act of July 1, 1898, there being nothing in section 68a of that act which prevents the parties from voluntarily doing before the petition is filed what that section itself requires to be done after the proceedings in bankruptcy are instituted." (The italics are ours.)

It will be observed, in the *Studley* case, the court limits a bank's right of set-off to deposits made by the insolvent *in due course of business.* The following inquiry, therefore, suggests itself: Was the deposit of $9,908.04, representing the sale price of the company's factory building, grounds and a part of its machinery, made in due course of business?

In *Walbrun v. Babbitt,* 83 U. S. 577, Mendelson, a retail merchant of a miscellaneous stock of goods, was insolvent and sold his stock of merchandise in bulk to one person. The court said:

"The 35th section of the bankrupt law condemns fraudulent sales equally with fraudulent preferences, and declares that if said sales are not *made in the usual and ordinary course of business of the debtor* that fact shall be *prima facie* evidence of fraud. The usual and ordinary

course of Mendelson's business was to sell at retail. * * *
It was to conduct a business of this character that the
goods were sold to him and, as long as he pursued the
course of a retailer, his creditors could not reach the
property disposed of by him, even if his purpose at the
time were to defraud them. But it is wholly different
when he sells his entire stock to one or more persons. This
is an unusual occurrence, out of the ordinary mode of
transacting such a business."

As a going concern, the business of the company was
the manufacture and sale of boxes and woodwork, and as
incidents thereto the company borrowed money from the
defendant upon its promissory notes, contracted indebted-
ness for materials purchased from others, maintained a
checking account with the defendant and, as funds were
received by the company, they were deposited in its check-
ing account with the defendant. Such deposits were de-
posits made in the ordinary course of business. After the
company disposed of its factory building, grounds and a
part of its machinery and removed and stored the unsold
portion, its usual course of business was thereby inter-
rupted. It was incapacitated from conducting the corpo-
rate enterprise in which it had been engaged. It was in-
solvent and unable to extricate itself from its financial
difficulties. It had ceased to be a "going concern," and at
this stage in the company's history the deposit in contro-
versy was made.

In *Oliver v. Lansing*, 59 Neb. 219, Justice Norval, in
writing the opinion, said: "A 'going concern' is, as we
understand it, some enterprise which is being carried on
as a whole, and with some particular object in view."

In *White, Potter & Page Mfg. Co. v. Pettes Importing
Co.*, 30 Fed. 864, in defining the term "going concern" as
applied to a corporation, the court said that it means that
it continues to transact its ordinary business.

In *American Woodworking Machinery Co. v. Agelasto*,
136 Fed. 399, defining when a manufacturing plant is a
"going concern," the circuit court of appeals, fourth cir-

cuit, said: "Our opinion is that the site, the structure, the motive power, and the machinery, whether the last be movable or immovable, combine to constitute the manufacturing plant, and the operations as manufacturer cannot begin until the plant is thus complete, or, in common parlance, until the plant is a 'going concern.'"

If, at the time of making the deposit of February 20, 1928, the company was not a going concern, then the deposit was not made in the ordinary course of business of the company.

In *Merrimack Nat. Bank v. Bailey,* 289 Fed. 468, the circuit court of appeals of the United States for the first circuit held: "Where the business of an insolvent was being liquidated by its creditors, its business being shut down, and the proceeds of liquidation were deposited in various banks, with an agreement and understanding as to the *pro rata* distribution among the creditors generally, the action of a bank of deposit, which was also a creditor, in appropriating the deposit as a set-off to its claim against the insolvent, was void, under the bankruptcy act, section 60a (Comp. St. sec. 9644), as an unlawful preference, and not within the rule that, where a deposit is made in good faith and *in the usual course of business* within four months before the petition in bankruptcy, the bank is allowed to credit the amount on notes of the bankrupt held by it." In the body of the opinion it is said: "We recognize, of course, the soundness of the rule stated in such cases as *American Bank & Trust Co. v. Coppard,* 227 Fed. 597, 142 C. C. A. 229, that: 'When an insolvent customer makes a deposit in his bank, in good faith and *in the usual course of business,* at any time within four months before the petition in bankruptcy is filed against him the bank is allowed to credit the amount on notes of the bankrupt held by it.' (Italics ours.) But in this case the deposits were not made 'in the usual course of business.' There was no 'usual course of business' after November 1. The insolvent's business was then shut down; it was being liquidated by its creditors; naturally enough, the proceeds of

liquidation were deposited in various creditor banks. *The understanding that no preferences should be given was, in effect, nothing but a recognition of the requirements of the law."* (Italics ours.)

In 263 U. S. 704, certiorari in the *Merrimack Nat. Bank* case was denied.

In *Gates v. First Nat. Bank of Richmond,* 1 Fed. (2d) 820, it is said: "Where vice-president of bank, who was chairman of creditors' committee, knew that debtor could not continue business unless creditors extended time for payment of debts, that creditors had not agreed to moratorium, and that debtor had suspended operations before it made deposits in bank, the bank had reasonable cause to believe, when it charged such deposits to the debtor's indebtedness in bank, that effect thereof would be to give it a preference." In the body of the opinion it is said: "The company was not, it is true, being operated by its creditors' committee; therefore the deposits in the bank were made by the company itself, rather than as in the *Merrimack* case. But the deposits were made after the suspension of operations, and the bank knew this. So I do not think the deposits were made in the ordinary course of business."

In *Union Bank & Trust Co. v. Loble,* 20 Fed. (2d) 124, the circuit court of appeals of the ninth circuit said: "Where bank, with knowledge of bankrupt's failing circumstances, suggested that bankrupt conduct a special sale to raise money to pay certain creditors, with a view to reorganizing and continuing the business, the fund realized on such sale and deposited in the bank *held* impressed with character of trust fund, so as to exempt it from bank's claim to right of set-off against debt owing it from bankrupt."

We conclude that the deposit by the company on February 20, 1928, was not made in the due course of business, that the defendant was not entitled to set off such deposit, or any part thereof, against the indebtedness due it from the company, and the act of the defendant in crediting

$9,745.93 of such deposit upon the note of the company was a "transfer" within the meaning of the bankruptcy act.

2.   Did the defendant receive a preference, voidable at the instance of the plaintiff, under the provisions of sections 60a and 60b of the bankruptcy act?

We quote so much of sections 60a and 60b as is necessary to the discussion of the question under consideration:

Section 60a.   "A person shall be deemed to have given a preference if, being insolvent, he has * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."   32 U. S. St. at Large, ch. 487, p. 799.

Section 60b.   "If a bankrupt shall have * * * made a transfer of any of his property, and if, at the time of the transfer, * * * the bankrupt be insolvent and the * * * transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such * * * transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person."   36 U. S. St. at Large, ch. 412, p. 842.

In *Emporia Loan & Investment Co. v. Rees,* 66 Fed. (2d) 225, the circuit court of appeals of the tenth circuit hold:

" 'Voidable preference' within bankruptcy law implies intent or willingness on creditor's part to deplete insolvent fund in order to obtain satisfaction in whole or in part of claim."

The burden of proof rested upon the plaintiff to establish by a fair preponderance of the evidence:   (1) A transfer of the company's property to the defendant within four months prior to the filing of the petition in bankruptcy; (2) that the company was insolvent at the time of the transfer; (3) that the enforcement of the

transfer would enable the defendant to secure a greater percentage of its claim than other creditors of the same class; and (4) that the defendant knew this or had reasonable cause to believe it.

(1) and (2) of the above requirements may be disposed of by the statement that it satisfactorily appears from the evidence and admissions of the defendant that the transfer of the $9,745.93 from the checking account of the company to the defendant was made February 21, 1928, that the company was insolvent at that time, and that the petition in bankruptcy was filed March 29, 1928.

Does the evidence show the enforcement of the transfer (meaning a finding that the act of the defendant in appropriating the company's deposit was not a voidable preference) would enable the defendant to secure a greater percentage of its claim than other creditors of the same class?

The record and evidence disclose that on February 20, 1928, the company's assets amounted to approximately 60 per cent. of its liabilities; that by appropriating the company's deposit the defendant received a sum approximating 60 per cent. of its entire claim, and that other creditors of the same class have received nothing upon their claims. Such evidence as there is tends to show that on February 21, 1928, the remaining assets of the company, consisting of a broken stock of merchandise, detached parts of machinery, office equipment, all in storage, and books of account were of the value of $6,200. Deducting the $9,745.93 received by the defendant, the company's liabilities remained about $15,700 made up of the $6,545, the balance of defendant's claim, and about $9,155 due to other creditors of the same class. Assuming that the remaining assets of the company produce $6,200, it would mean a dividend to all creditors of approximately 40 per cent. upon such remaining liabilities.

If, *at the time,* the defendant appropriated the checking account of the company, its act in so doing was lawful, and did not constitute a voidable preference, it carried

with it, as a part of the same transaction, the right to the defendant to share, *pro rata,* with other creditors of the same class, in the distribution of the remaining assets of the bankrupt, and thus in the final analysis the defendant would have received approximately 77 per cent. of its entire claim, while other creditors of the same class would receive only about 40 per cent. of their respective claims. It necessarily follows that the validation of the act of the defendant, in appropriating the company's deposit, would secure to the defendant a greater percentage of its claim than other creditors of the same class.

In *Commerce-Guardian Trust & Savings Bank v. Devlin,* 6 Fed. (2d) 518, it is said: "Though bankrupt's liabilities were about twice amount of assets, a creditor who was paid 48 per cent. of its claim shortly before bankruptcy received a preference, since if preference were upheld, creditor could still claim balance of debt and share with others in distribution." In the body of the opinion it is said: "We see no merit in the suggestion that the bank got no greater percentage on its own claim (about 48 per cent.) than creditors generally would have had, if we accept the estimate of 50 per cent. made by the bankrupt's bookkeeper. The bank actually received 100 per cent. on $6,300 of its claim, and, if the preferences were upheld, would be entitled to receive upon the balance of its claim the same percentage as other creditors of the same class."

In *Armour & Co. v. Callahan,* 25 Fed. (2d) 584, the circuit court of appeals of the fourth circuit said: "Creditor of a bankrupt corporation may not, on eve of bankruptcy, take possession of assets of the estate * * * and thereby virtually secure a part payment of his claim."

Did the defendant know, or have reasonable cause to believe, the enforcement of the preference it received, by appropriating the company's deposit, would enable it to receive a greater percentage of its claim than other creditors of the same class?

Mr. Charles Thornberry, a witness, testified he was president and manager of the Lincoln Box and Manufac-

turing Company at the time it quit the business of manufacturing and selling goods, and so on, *in February*, 1928, and had been such president and manager for three or four years; that on February 20, 1928, he sold the real estate, building and some of the equipment of the company; that he told both Beaumont and Coe, he thinks, to deposit proceeds of sale in the bank together with whatever he could collect and build up a fund for the benefit of creditors.

Mr. F. M. Beaumont, another witness, testified that from 1911 to July, 1928, he was an officer of the defendant bank—vice-president for a number of years—then cashier for a number of years; that he knew of the financial difficulties of the Cushman Motor Company, that the Lincoln Box and Manufacturing Company was then a subsidiary corporation of Mr. Sawyer in connection with the Cushman Motor Company; that the Lincoln Box and Manufacturing Company was then indebted to the defendant bank; that we insisted that this loan be cut down, it was an excessive loan; that it was in financial difficulties; that from that time on the defendant tried to keep pretty close supervision over the business matters of the Lincoln Box and Manufacturing Company; that as an officer of the bank during those years he consulted with Mr. Thornberry frequently in reference to the matters; that Mr. Coe, also an officer of the Nebraska State Bank during those years, was in constant consultation with Mr. Thornberry with reference to the business; that the matter of the sale of the property was discussed on a number of occasions prior to the time the actual sale was made; we allowed him to go ahead and pay off small outstanding foreign accounts; we gave our consent for him to issue checks to do that; had several talks with Mr. Thornberry at the bank with reference to a sale of the property; and on one or two occasions at the factory; we wanted to get the line reduced and were anxious to have a sale; Mr. Coe and Thornberry discussed the matter several times in my presence; that we would never have given our consent

that the amount received for the plant would be applied on the liquidation of the indebtedness of the corporation, as we held the stock as collateral for our notes we didn't think he had a right to sell the property and leave us sitting high and dry; I don't recall the date of the sale, I do know that Mr. Thornberry came in after the regular banking hours and the tellers were all out of their cages at that time and I was in my office, and Mr. Thornberry says, I want to make a deposit, and I personally handed him a deposit slip and he filled it out and took credit for it; I consulted with Mr. Coe that night or the next morning with reference to the deposit and what should be done with it; consulted with attorney Stout about the matter; we turned down some checks he had issued on the deposit and we simply told Mr. Thornberry we had applied the money on his indebtedness; he said he would have to pay the taxes, he had given a check to the county treasurer for the taxes and if the check was not paid it might upset the deal, so we paid that check to the county treasurer; do not recall that Thornberry contended that I had promised if this sale went through the money would be applied in liquidation of indebtedness, we would never have promised anything like that, we felt that we had the first right to that money over everybody else.

In *Schoenbrod v. Central Trust Co.*, 238 Fed. 775, the circuit court of appeals of the seventh circuit held: "Under Bankr. Act July 1, 1898, c. 541, sec. 60b, 30 Stat. 562 (Comp. St. 1913, sec. 9644), making void a transfer within four months before the filing of the petition in bankruptcy, if the bankrupt was then insolvent, and the transfer operated as a preference, and the person receiving it had reasonable cause to believe that it would effect a preference, it is not necessary that the creditor actually knew that the debtor was insolvent, but the preference is void if he had information sufficient to have put an ordinary business man on inquiry as to facts which would show insolvency, and his failure to make such inquiry is no excuse."

In *In re Putterman,* 46 Fed. (2d) 175, the court said: "Bank receiving deposits to apply on debts, knowing that bankrupt was insolvent, had reason to believe that the act created preference of itself."

In *Mechanics & Metals Nat. Bank v. Ernst,* 58 L. Ed. 121 (231 U. S. 60) the court said: "Deposits made by an insolvent customer after the bank cashier has forbidden the payment of checks against the deposit account, and but a few hours before an involuntary petition in bankruptcy was filed against the customer, constitute a voidable preference, and cannot be allowed to the bank by way of setoff against the customer's indebtedness to the bank."

From all the facts and circumstances proved, and the natural and reasonable inferences to be drawn from the close supervision maintained by the officers of the defendant over the affairs of the company, and their opportunity and duty to learn its financial condition, the conclusion is inevitable that such officers not only had reasonable cause to believe, but knew, the enforcement of the preference the defendant received by appropriating the company's deposit would enable it to receive a greater percentage of its claim than did other creditors of the same class, and that in appropriating such deposit the officers of the defendant were acting upon such knowledge and belief.

This is not a trial *de novo,* but an inquiry to ascertain whether the findings and judgment of the trial court are supported by sufficient competent evidence, and if we find they are not so supported, after giving to such findings and judgment the presumptions to which they are entitled under the decisions of this court, then to ascertain whether the plaintiff sustained the burden of proof upon all questions necessary to have entitled him to recover upon the trial of this action. Our findings are that the findings and judgment of the trial court are not supported by sufficient competent evidence and that the plaintiff did sustain the necessary burden of proof to entitle him to recover.

In reaching these conclusions, we have given consideration to the cases of *Peck & Co. v. Whitmer,* 231 Fed. 893,

*Mansfield Lumber Co. v. Sternberg*, 38 Fed. (2d) 614, and *Latrobe v. Cross Co.*, 29 Fed. (2d) 210, cited by counsel for defendant. The proposition that, if a transfer or preference is enforced, the creditor receiving the same will be entitled to share *pro rata* with other creditors of the same class in the distribution of the remaining assets of the bankrupt estate, to the extent of the balance due such creditor, was either not an issue, or, if an issue, it was not passed upon in those cases, and therefore they are not helpful in determining this case.

It follows that the trial court erred in not entering judgment in favor of the plaintiff for $9,745.93, together with interest thereon at the rate of 7 per cent. per annum from the date the petition was filed herein. *Plymouth County Trust Co. v. MacDonald*, 60 Fed. (2d) 94.

The judgment of the district court is reversed, with instructions to enter judgment in favor of the plaintiff for $9,745.93, together with interest thereon at 7 per cent. per annum from the filing of the petition herein.

REVERSED.