BOSTON ELEVATED RAILWAY COMPANY *vs.* METROPOLITAN
TRANSIT AUTHORITY & others.

Suffolk. October 4, 1948. — January 4, 1949.

Present: QUA, C.J., LUMMUS, DOLAN, WILKINS, & WILLIAMS, JJ.

*Boston Elevated Railway Company. Contract,* Construction, For assumption of liabilities, For payment of taxes, With Commonwealth. *Sale,* Contract of sale. *Commonwealth,* Contracts. *Words,* "Indebtedness," "Liabilities," "Outstanding," "Going concern."

In making with Boston Elevated Railway Company the contract respecting sale of the assets, property and franchises of the company, set forth in Spec. St. 1918, c. 159, as amended and extended by St. 1931, c. 333, the Commonwealth did not act in a sovereign capacity, but put itself in the position of a private citizen, and the contract must be construed as would a contract between individuals.

Construction of the entire contract made between the Commonwealth and Boston Elevated Railway Company for a sale by the company of its assets, property and franchises to a political subdivision of the Commonwealth under the provisions of Spec. St. 1918, c. 159, as amended and extended by St. 1931, c. 333, to determine whether a Federal tax assessed by reason of a capital gain realized by the company from the sale was to be assumed by the political subdivision, should be guided by the general rule of construction that, where it is sought to shift a burden of taxation from the person upon whom it is imposed by statute, the intention of the parties to accomplish that result must clearly appear.

In the contract, established by Spec. St. 1918, c. 159, as amended and extended by St. 1931, c. 333, for a sale upon a certain consideration by Boston Elevated Railway Company to a political subdivision of the Commonwealth of the company's "whole assets, property and franchises as a going concern," the provision for an assumption by the political subdivision "of all" the company's "outstanding indebtedness and liabilities" meant only outstanding indebtedness and liabilities of the company, actual or contingent, which arose during the operation of the public transportation system by the company as a going concern, and did not include a Federal tax assessed by reason of a capital gain realized by the company upon and by reason of the consummation of the sale.

Itemized services of counsel employed by Boston Elevated Railway Company and certain extra services of the chairman of the board of directors rendered during completion of arrangements for consummation of the sale by the company of its assets, property and franchises to a political subdivision of the Commonwealth under Spec. St. 1918,

c. 159, as amended and extended by St. 1931, c. 333, including services rendered prior to the consummation of the sale in attempting to throw upon the political subdivision the burden of a Federal capital gains tax to result from the sale, were "outstanding indebtedness and liabilities" incurred by the board of directors of the company under authority conferred upon them by § 4 of Spec. St. 1918, c. 159, which, under the terms of the statutory contract, were assumed by the political subdivision.

BILL IN EQUITY, filed in the Superior Court on July 2, 1947.

The suit was reserved and reported by *Hudson*, J., for determination by this court.

*R. H. Holt & J. L. Hall*, (*R. Wait* with them,) for the plaintiff.

*C. B. Rugg*, (*G. B. Rowell & R. W. Cutler, Jr.*, Assistant Attorneys General, *W. F. Farr & B. J. Sargent* with him,) for the defendants.

WILKINS, J. This bill in equity under G. L. (Ter. Ed.) c. 231A, inserted by St. 1945, c. 582, § 1, seeks a declaration that the Metropolitan Transit Authority by contract has assumed, and is obligated to pay, the plaintiff's Federal income tax on a "capital gain" realized by the plaintiff from the sale to the authority of "its whole assets, property and franchises as a going concern." The defendants, who are the authority and its five trustees, in their answer seek by way of counterclaim a declaration that the authority has not so assumed, and is not obligated to pay, certain bills of the plaintiff's lawyers and of the chairman of its board of directors for services in relation to that sale. The case was heard on the pleadings and a statement of agreed facts. The judge found the facts to be as agreed, and reserved and reported the case, without determination, for the consideration of this court. G. L. (Ter. Ed.) c. 214, § 31.

The plaintiff is a street railway corporation incorporated under St. 1894, c. 548, and until noon on August 29, 1947, it owned a rapid transit system in metropolitan Boston. That system it managed and operated until June 30, 1918. On July 1, 1918, by virtue of its acceptance of Spec. St. 1918, c. 159, the management and operation devolved upon a board of trustees (hereinafter called the public trustees) appointed by the Governor. The amendment of that

statute by St. 1931, c. 333, was also accepted by the plaintiff, and the public trustees continued the management and operation until noon on August 29, 1947.[1]

The contract of which interpretation is sought is contained in Spec. St. 1918, c. 159, as amended and extended by St. 1931, c. 333, known as the public control act.[2] The act originally provided: "The acceptance of this act by the Boston Elevated Railway Company shall constitute an agreement upon its part to sell to the commonwealth or any political subdivision thereof at any time during the period of public management and operation its whole assets, property and franchises as a going concern upon the assumption by the commonwealth of all its outstanding indebtedness and liabilities and the payment of an amount in cash equal to the amount paid in in cash by its stockholders for stock then outstanding" (Spec. St. 1918, c. 159, § 16). In the amendment the language respecting the option and the assumption of indebtedness and liabilities is preserved in substantially identical form, but a change was made in the amount of the cash payment. After amendment the act reads: "The acceptance of this act by the company shall constitute . . . an agreement by the company to sell to the commonwealth or any political subdivision thereof . . . at any time during the period of public management and operation, its whole assets, property and franchises as a going concern upon the assumption by the commonwealth

---

[1] It is provided in St. 1947, c. 544, § 2: "As of the effective date of their qualification under this act, the trustees shall succeed to the offices of the board of trustees," that is, the public trustees appointed under the public control act, "and shall act in their stead . . . and thereupon the term of the present board of trustees . . . shall terminate."

[2] Statute 1931, c. 333, § 20: "This act shall be regarded as amendatory of said chapter one hundred and fifty-nine of the Special Acts of nineteen hundred and eighteen, and this act and said chapter shall, for purposes of interpretation and construction, be treated as one act." These statutes have been considered in numerous opinions of this court. *Opinion of the Justices,* 231 Mass. 603. *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403. *Chelsea* v. *Treasurer & Receiver General,* 237 Mass. 422. *Cambridge* v. *Boston Elevated Railway,* 241 Mass. 374, 376. *Opinion of the Justices,* 261 Mass. 523. *Opinion of the Justices,* 261 Mass. 556. *Opinion of the Justices,* 293 Mass. 589. *Opinion of the Justices,* 309 Mass. 609. *Boston Elevated Railway* v. *Commonwealth,* 310 Mass. 528. *Auditor of the Commonwealth* v. *Trustees of Boston Elevated Railway,* 312 Mass. 74. *Attorney General* v. *Trustees of Boston Elevated Railway,* 319 Mass. 642. *Assessors of Boston* v. *Boston Elevated Railway,* 320 Mass. 588, 596–597.

or such political subdivision of all its outstanding indebtedness and liabilities, and the payment of an amount in cash equal to any amount paid in in cash for stock hereafter issued and also an amount in cash equal to one hundred and five dollars per share for all common stock at present issued and then still outstanding decreased by one half of any sums hereafter assessed under the provisions of said chapter one hundred and fifty-nine or of this act upon cities and towns served by the company which have not then been repaid to the commonwealth provided however that such decrease shall not reduce the amount payable on account of said common stock below the amount of eighty-five dollars per share" (St. 1931, c. 333, § 17). Under both of the foregoing sections a sale under the option was to effect a dissolution of the company subject to the general statutory provisions relative to the dissolution of corporations.[1]

The authority is "a body politic and corporate and a political subdivision of the commonwealth" created by St. 1947, c. 544, § 1, which became effective June 19, 1947. Its five trustees are appointed by the Governor (§ 2). The authority was "authorized and directed to exercise the option" set forth in St. 1931, c. 333, § 17, and the trustees were "authorized and directed" in the name of the authority to notify the plaintiff "that the authority elects as of a day and time to be specified in said notice," but not later than August 30, 1947, "to exercise such option" (§ 5). Section 5 further provided: "Upon the date and the time specified in such notice to the company, the whole assets, property and franchises of the company as a going concern shall, without further conveyance and by virtue of this act, be and become vested in the authority; and all

---

[1] In St. 1931, c. 333, § 17, this was expressed as follows: "A sale by the company under the foregoing option shall work a dissolution of the company subject to the provisions of sections fifty-one and fifty-two of chapter one hundred and fifty-five of the General Laws." General Laws (Ter. Ed.) c. 155, § 51, provides: "Every corporation whose charter expires by its own limitation or is annulled by forfeiture or otherwise, or whose corporate existence for other purposes is terminated in any other manner, shall nevertheless be continued as a body corporate for three years after the time when it would have been so dissolved for the purpose of prosecuting and defending suits by or against it and of enabling it gradually to settle and close its affairs, to dispose of and convey its property and to divide its capital stock, but not for the purpose of continuing the business for which it was established."

the *then* outstanding indebtedness and liabilities of the company shall, without further action and by virtue of this act, be assumed by the authority in accordance with the provisions of said section seventeen. In accordance with the provisions of said section seventeen, there shall thereupon and forthwith *thereafter* be paid to the company an amount in cash equal to eighty-five dollars per share for all the common stock of the company issued and outstanding" (emphasis supplied). Upon such cash payment, "all claims of every kind and nature against said authority by the company are by virtue of this act released, and thereafter no suit shall be brought against the authority by the company" (§ 6).

By reason of § 6 and of the italicized words in § 5, we are told in the plaintiff's brief, the present suit was brought on July 2, 1947, to enjoin the authority and its trustees from giving notice of the election to exercise the option and from tendering the cash payment, and, in the alternative, for the declaration mentioned at the opening of this opinion. On July 8 a prayer for preliminary injunction was denied after hearing. On the same day the defendant trustees gave notice in writing of the authority's election to exercise the option "as of" August 29, 1947, at noon. On August 21 an interlocutory decree, entered by consent, declared that the option had been effectively and validly exercised by the authority as provided in § 17 of the public control act "without modification" by St. 1947, c. 544, and that "upon the payment and acceptance of the cash purchase price, provided in said § 17, being an amount equal to $85 per share for all the common stock" of the company issued and outstanding as specified in c. 544, § 5, the authority "will have assumed and become liable to pay all the outstanding indebtedness and liabilities" of the company as provided in § 17 "without modification" by c. 544. The interlocutory decree further declared that, "upon the assumption of indebtedness and liabilities" by the authority, the suit should proceed to a final determination of the questions relating to the Federal "capital gain" tax raised by the prayer for a declaration.

On August 25 the company's board of directors voted to accept from the authority the sum of $20,297,490 as the cash payment required by the option. On August 27 the board of directors "requested the public trustees to accrue immediately on the books of the company as a liability the sum of $6,362,870.75 as the estimated Federal income tax to result from the sale of the company's property to the authority." This amount was a tentative figure agreed upon by the company and the commissioner of internal revenue to be "set aside out of the cash purchase price, when paid, pending the final determination and assessment of the correct tax in order to avoid a threatened jeopardy assessment." On August 28 "the public trustees declined this request on the ground that the tax could not accrue until the sale was consummated and that the liability was not one to be assumed by the authority." On August 29, 1947, the authority paid, and the company accepted, $20,297,490 as the cash purchase price. On March 15, 1948, the company filed an income tax return for the calendar year 1947 showing a tax of $6,177,796.50 wholly due to the "capital gain resulting from sale of company August 29, 1947." See U. S. C. (1946 ed.) Title 26, § 117 (c) (1), (j).

The Commonwealth in making with the company the contract contained in the public control act did not proceed in a sovereign capacity, but put itself in the position of a private citizen. *Boston v. Treasurer & Receiver General,* 237 Mass. 403, 413. *Boston Elevated Railway v. Commonwealth,* 310 Mass. 528, 577. *Auditor of the Commonwealth v. Trustees of Boston Elevated Railway,* 312 Mass. 74, 77. *Attorney General v. Trustees of Boston Elevated Railway,* 319 Mass. 642, 653. That contract is to be construed as would be a contract between individuals. *Boston Molasses Co. v. Commonwealth,* 193 Mass. 387, 389. *Commercial Wharf Corp. v. Boston,* 194 Mass. 460, 467. *Massachusetts Institute of Technology v. Boston Society of Natural History,* 218 Mass. 189, 191. *Hollerbach v. United States,* 233 U. S. 165, 171. *Reading Steel Casting Co. v. United States,* 268 U. S. 186, 188. *Lynch v. United States,* 292 U. S. 571, 579.

1. The precise question raised by the bill is whether

according to the principles for the interpretation of contracts the tax on the "capital gain" resulting from the sale is embraced within the authority's assumption of all the company's "outstanding indebtedness and liabilities." "Indebtedness" and "liabilities," like many words in everyday use, are commonly not of doubtful meaning, and yet their effect will vary according to the subject to which they refer and the circumstances in which they are used.

Whether "indebtedness" standing alone could here apply to a tax [1] need not be decided because of its use in conjunction with "liabilities." It is on the latter word that the company relies. "Debt" and "indebtedness" are not synonymous with "liability." *Lowery* v. *Fuller*, 221 Mo. App. 495, 503. "Liabilities" is a term "of large significance," and is technically more inclusive. *Price* v. *Parker*, 197 Mass. 1, 3. See *Bradford* v. *Storey*, 189 Mass. 104, 106. It is an appropriate word to express obligations sounding in contract or tort or founded upon a judgment. *Rose-Derry Corp.* v. *Proctor & Schwartz, Inc.* 288 Mass. 332, 338. It has been held in some circumstances to include taxes. *Shepard* v. *Commissioner of Internal Revenue*, 101 Fed. (2d) 595, 598 (C. C. A. 7). *Union Bank & Trust Co.* v. *Phelps*, 228 Ala. 236, 238. *Vicksburg Waterworks Co.* v. *Vicksburg Water Supply Co.* 80 Miss. 68, 72. *State* v. *Leslie*, 100 Mont. 449, 457. *Ivester* v. *State*, 183 Okla. 519, 522. *State* v. *Pioneer Oil & Refining Co.* (Tex. App.) 292 S. W. 869, 871. The word undoubtedly may comprise contingent obligations. *Cochran* v. *United States*, 157 U. S. 286, 296. *United Cigarette Machine Co. Ltd.* v. *Winston Cigarette Machine Co.* 194 Fed. 947, 960 (C. C. A. 4). *Goldenberg* v. *Wardell*, 92 Fed. (2d) 539, 542 (C. A. D. C.). *Mayfield* v. *First National Bank*, 137 Fed. (2d) 1013, 1019 (C. C. A. 6). *Coulter Dry Goods Co.* v. *Wentworth*, 171 Cal. 500, 502–503. *Daniels* v. *Goff*, 192 Ky. 15, 19–20. *Reynolds* v. *Waterville*,

---

[1] See *Boston* v. *Turner*, 201 Mass. 190, 193; *Commissioner of Banks* v. *Highland Trust Co.* 283 Mass. 71, 74; *Nichols* v. *Commissioner of Corporations & Taxation*, 314 Mass. 285, 306; Cooley, Taxation (4th ed.) § 22. See also *Atlas Bank* v. *Nahant Bank*, 3 Met. 581, 582; *Commissioner of Internal Revenue* v. *Tennessee Co.* 111 Fed. (2d) 678, 679–680 (C. C. A. 3); *Lenox Realty Co.* v. *Hackett*, 122 Conn. 143, 146–147; *Perry* v. *Johnson*, 106 Okla. 32, 34; 42 C. J. S., Indebtedness, 556–557.

92 Maine, 292, 319. *Enyeart* v. *Lincoln*, 136 Neb. 146, 152. *First National Bank* v. *National Surety Co.* 228 N. Y. 469, 473–474. *Reconstruction Finance Corp.* v. *Gossett*, 130 Texas, 535, 547. *Utah* v. *Sheets*, 26 Utah, 105, 108–109.

Under the contract the indebtedness and liabilities, to fall within the assumption, must be "outstanding." Although our conclusion is not affected, we are not accepting the company's contention that this adjective modifies only "indebtedness." It seems to us equally to modify "liabilities."

"Outstanding" has been defined as meaning undischarged, uncollected, unpaid, unsettled, undetermined (*Norton* v. *Lusk*, 248 Ala. 110, 120); and as that "that stands over or continues in existence, that remains undetermined, unsettled or unpaid." *New York Trust Co.* v. *Portland Railway*, 197 App. Div. (N. Y.) 422, 428. "Outstanding indebtedness" has been held to mean "obligations already validly fixed." *Walton* v. *Arkansas Construction Commission*, 190 Ark. 775, 780. See *Royal* v. *Sampson County*, 214 N. C. 259, 261. In *Perret* v. *King*, 30 La. Ann. 1368, in the purchase of a newspaper the assumption of "all the outstanding liabilities" was held not to make the purchaser liable for damages subsequently awarded in a libel suit which was pending at the time of the sale. Both briefs cite *State* v. *Harris*, 343 Mo. 252, 260, where it was said, "A policy, debt, title, liability or the like, is outstanding when it is existing, undischarged and (sometimes) valid. . . . An insurance policy or liability therefore would be outstanding in this State when it is existing and unsatisfied in Missouri."

The scope of the authority's general undertaking is not to be delineated by isolating words and interpreting them as though they stood alone. *Commissioner of Corporations & Taxation* v. *Chilton Club*, 318 Mass. 285, 288. Not only must due weight be accorded to the immediate context, but no part of the contract is to be disregarded.

The original statute provided that the company should, prior to or at the time of the acceptance of the act, raise $3,000,000 in cash by the issue of preferred stock, $1,000,000

to be set aside as a reserve fund, and the balance to be subject to the disposition of the trustees to pay for the cost of additions and improvements (Spec. St. 1918, c. 159, § 5). The remainder of the act, including the option to purchase (§ 16) quoted above, was to take effect upon its acceptance by the stockholders (§ 18). The public trustees were authorized to exercise all the rights and powers of the company and its board of directors and, upon behalf of the company, to receive and disburse its income and funds. They were empowered to appoint and remove in their discretion all officers save the board of directors (§ 2). They were required to include in the cost of service certain enumerated items, and dividends at stated rates were to be paid on the common stock and fixed dividends on the preferred (§ 6). It was a duty of the public trustees to maintain the property "in good operating condition and to make such provision for depreciation, obsolescence and rehabilitation, that, upon the expiration of the period of public management and operation, the property shall be in good operating condition" [1] (§ 13). Any deficiency of income to meet the cost of service was to be paid from the $1,000,000 reserve fund (§ 9), and, should that be insufficient, from the treasury of the Commonwealth, in that event to be assessed upon the cities and towns in the area served by the company (§§ 11, 14). Public management was to continue for ten years (§ 2) and thereafter until terminated by the Commonwealth (§ 12). The public operation was undertaken by the Commonwealth, "not as a source of profit, but solely for the general welfare." *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 413. *Auditor of the Commonwealth* v. *Trustees of Boston Elevated Railway*, 312 Mass. 74, 77.

The main plan of the public control act was retained unaltered in St. 1931, c. 333. In that statute certain changes were made, of which only a few need be mentioned. The period of public management and control was extended to July 1, 1959, and thereafter until terminated by the Com-

---

[1] "Both the company and the Commonwealth must be taken to have understood that the property was in poor operating condition and to have entered into the contract with that situation in mind." *Attorney General* v. *Trustees of Boston Elevated Railway*, 319 Mass. 642, 661–662.

monwealth (§ 1). The rate of dividends on the common stock was reduced from six to five per cent (§ 2). The public trustees were authorized to retire the preferred stock (§ 4). The provision for change in the cash payment in the event of the exercise of the option (§ 17) has already been quoted.

We have for guidance the general rule of construction that "where . . . it is sought to shift the burden of taxation from the person upon whom it is imposed by statute, the intention of the parties to accomplish that result must clearly appear." *United Shoe Machinery Corp.* v. *Gale Shoe Manuf. Co.* 314 Mass. 142, 149. The question has often arisen in this Commonwealth between lessor and lessee. In that relationship it is the "general rule that, where the lease is silent on the subject, the obligation to pay taxes rests upon the lessor. . . . That, however, is not an inflexible principle. It yields to a contrary presumption where overbalancing considerations lead to that result." *Pittsfield & North Adams Railroad* v. *Boston & Albany Railroad,* 260 Mass. 390, 397. For a discussion of many such cases, see *Eastern Massachusetts Street Railway* v. *Boston Elevated Railway,* 310 Mass. 659, where it was said, at page 671, "An intention to add to the rent in this manner is not lightly to be implied."

Here the thing purchased was the company's "whole assets, property and franchises as a going concern." The expression "going concern" looms of paramount importance. It makes the continued transaction of ordinary business a fundamental prerequisite. *White, Potter & Paige Manuf. Co.* v. *Henry B. Pettes Importing Co.* 30 Fed. 864, 865 (C. C. E. D. Mo. E. D.). *Slaughter* v. *Burgeson,* 203 Iowa, 913, 916. *Rothery* v. *Lowe,* 144 Md. 405, 412. *Wilson* v. *Nebraska State Bank,* 126 Neb. 168, 173.

We think that the assumption by the authority was of the "outstanding indebtedness and liabilities" of the company as an operating public transportation system, and consisted of all the liabilities, actual or contingent — but only those — which arose during the conduct of the business of that system by the company as a going concern.

There is involved no elaborate refinement in the definition of "outstanding." That word, for our purposes, adds. nothing to the connotation of "liabilities" save the precautionary enjoinder, superfluous in the present connection, that the liabilities assumed must be valid, existing, and undischarged at the moment of purchase at noon on August 29, 1947. Once the transaction was closed, the authority owned the transportation system and owed by assumption the liabilities theretofore incurred in its operation, while the company held the cash consideration subject to any tax obligations which its receipt entailed.

The "capital gain" tax was not one of the assumed liabilities, because it was not an incident to the operation by the company of the business of the transportation system, but sprang from and was solely the result of its sale. Until there was a transaction completed by the payment of the cash consideration, there were no taxable gain and no tax liability. *Reid Ice Cream Corp.* v. *Commissioner of Internal Revenue,* 59 Fed. (2d) 189, 191 (C. C. A. 2). *West Texas Refining & Development Co.* v. *Commissioner of Internal Revenue,* 68 Fed. (2d) 77, 80 (C. C. A. 10). The "statute taxes gains from sales, not estimated gains from contracts to sell." *Consolidated Utilities Co.* v. *Commissioner of Internal Revenue,* 84 Fed. (2d) 548, 550 (C. C. A. 5). The notice in writing on July 8 from the trustees to the company, electing to exercise the option "as of" August 29, did not constitute a sale, but created an executory contract to sell. *Braintree Water Supply Co.* v. *Braintree,* 146 Mass. 482, 486. *Cohasset Water Co.* v. *Cohasset,* 321 Mass. 137, 145. *Lucas* v. *North Texas Lumber Co.* 281 U. S. 11, 3. This was not changed by the decree of August 21. Until the payment of the cash consideration on August 29 there still was no more than an executory contract to sell. In the interval possession and title belonged and continued to be in the company.[1] The sale did not occur until the payment

---

[1] The public trustees were agents of the company, not of the Commonwealth. Spec. St. 1918, c. 159, § 2. The trustees appointed under St. 1947, c. 544, § 2, upon their qualification as such and succession to the offices of the public trustees, were to "act in their stead." In so acting they were agents of the company.

of the cash consideration. *Commissioner of Internal Revenue*
v. *Segall,* 114 Fed. (2d) 706, 709–710 (C. C. A. 6), certiorari
denied sub nomine *Segall* v. *Commissioner of Internal
Revenue,* 313 U. S. 562. See *Bedell* v. *Commissioner of
Internal Revenue,* 30 Fed. (2d) 622, 624 (C. C. A. 2); *Chis-
holm* v. *Commissioner of Internal Revenue,* 79 Fed. (2d) 14,
15 (C. C. A. 2); *Consolidated Utilities Co.* v. *Commissioner
of Internal Revenue,* 84 Fed. (2d) 548, 549–550 (C. C. A. 5);
*Stanton* v. *Commissioner of Internal Revenue,* 98 Fed. (2d)
739, 741 (C. C. A. 7), certiorari denied 305 U. S. 650. That
the company's books were kept, and its tax returns made,
on an accrual basis does not affect the result. See *Lucas* v.
*North Texas Lumber Co.* 281 U. S. 11, 13–14. Contrary to
the contention of the company, the tax had not technically
accrued and was not a liability prior to the assumption
of liabilities by the authority. We omit any attempt to
undertake a detailed discussion of all the Federal cases
cited on the briefs.

On the issue of construction of the contract another
consideration carries great weight. "The general principle
has been recognized that 'payments made by a third person
to discharge an obligation of a taxpayer must be considered
as income of the latter if such payments were made in
satisfaction of an indebtedness due from such person to the
taxpayer.' *Commissioner of Corporations & Taxation* v.
*Dalton,* 304 Mass. 147, 152." *Commissioner of Corporations
& Taxation* v. *Thayer,* 314 Mass. 375, 378. As a corollary,
such a payment of a taxpayer's Federal income tax is
additional income to the taxpayer. *Old Colony Trust Co.*
v. *Commissioner of Internal Revenue,* 279 U. S. 716, 729.
*United States* v. *Boston & Maine Railroad,* 279 U. S. 732.
And hence, if a buyer assumes the "capital gain" tax of the
seller, the latter's taxable gain is commensurately increased.
*Acme Coal Co.* v. *United States,* 44 Fed. (2d) 95, 100 (Ct.
Cl.). See *Lash's Products Co.* v. *United States,* 278 U. S.
175. In the company's tax return it is stated that all
doubtful questions (other than the effect of the assumption
by the authority) have been resolved against the taxpayer.
Yet in computing the amount of $6,177,796.50, no effect

was given to this principle, which, on the company's contentions before us, would result in an additional payment by the authority of twenty-five per cent of the tax, or $1,544,449.13. And, theoretically and conceivably, there would be further payments by the authority of what has been described as "a tax upon a tax" ad infinitum, presenting a problem in calculus.[1] See, however, *Old Colony Trust Co.* v. *Commissioner of Internal Revenue*, 279 U. S. 716, 731; *Sayles* v. *Commissioner of Corporations & Taxation*, 286 Mass. 102, 106. Such a result could hardly have been within the contemplation of the parties. It does not seem reasonably to have been intended by the language of their contract. To impose this extraordinary, and perhaps progressive, obligation on the buyer the wording of the agreement should be most explicit, and appropriate phraseology would not have been difficult to use.

Our conclusion, which to us seems required by the natural import of the contract, is confirmed by observing the situation forming the background of the legislation comprising the contract. The agreed facts do not contain a concise and explicit statement as to the financial condition of the company and the state of its physical assets on June 30, 1918. It does there appear, however, that the company's provisions for depreciation had been grossly inadequate. In the preceding six months its operations had shown a deficit of more than half a million dollars. During the period beginning September 30, 1898, and ending June 30, 1918, it had paid dividends on its capital stock in the total amount of $16,433,471, while its net earnings before dividends in the same period were but $16,233,305.32. Its balance sheet and that of the West End Street Railway,[2] of which it was lessee, are annexed to the statement of agreed facts, and disclose a condition of doubtful financial stability. The stockholders, as this court has said, had "an otherwise losing and possibly confiscatory investment." *Opinion of the Justices*, 231 Mass. 603, 613.

---

[1] See *United States* v. *Norwich & Worcester Railroad*, 16 Fed. (2d) 944 (D. C. Mass.); *Estate of Levalley*, 191 Wis. 356.

[2] The companies consolidated in 1922 pursuant to St. 1911, c. 740.

The company contends that the "contract must be interpreted in the light of the fact that during the period of public control the Commonwealth and the public trustees had the power to, and by their actions did, fix the amount of the 'gain' which gave rise to the tax." It is argued that the "capital gain" was entirely "technical"; that the company "reaped no profit at all"; that it "sold assets which had cost it $120,000,000 for $106,000,000"; and that the so called "capital gain" was "a consequence of the operations carried on by the public trustees." Granting that the public trustees had such power, we do not see how these other considerations, if true, are material to the construction of a contract first entered into in 1918. It seems of no consequence on the issue of interpretation that the public trustees perhaps could have made some other treatment of the matter of depreciation which might have resulted in a smaller tax or even in no tax. It is not questioned that the tax could be lawfully assessed. The right of the public trustees to act as they did is not challenged. It is stated among the agreed facts: "The allowance charged to cost of service by the public trustees . . . for depreciation of property and for obsolescence and losses in respect to property sold, destroyed or abandoned was the amount which the public trustees in the proper exercise of the discretion vested in them . . . deemed necessary and advisable"; and "No question is raised in this case as to the adequacy or reasonableness of the deductions thus claimed for Federal income tax purposes." The authority, with much good reason, it seems to us, denies that the assets cost the company $120,000,000, but it would not be profitable, in our opinion, to analyze this subordinate issue in accounting. In the same category are the contentions that during the period of public control the Commonwealth did not reimburse the company for some of the deficits incurred by it, and that the public trustees issued bonds of the company at a discount.

Another contention is that the company and its stockholders in accepting the statute of 1931, "which included an option to buy *all* the assets of the company at a stipu-

lated price per share plus assumption of *all* liabilities, the company thereby being immediately dissolved," reasonably must have understood that the stipulated price would be a net figure available for immediate distribution without reduction by the "capital gain" tax or any other liability except perhaps the nominal expense of making distribution. The argument runs in this fashion. Under the 1918 statute the cash to be paid was to be "equal to the amount paid in in cash by its stockholders for stock then outstanding" (Spec. St. 1918, c. 159, § 16). This, it is said, fairly meant that the stockholders would get their money back. Under the 1931 statute the cash to be paid was to be an amount "equal to any amount paid in in cash for stock hereafter issued and also an amount in cash equal to one hundred and five dollars per share for all common stock at present issued," subject to decrease by deficits, "provided however that such decrease shall not reduce the amount payable on account of said common stock" below $85 a share (St. 1931, c. 333, § 17). This, it is said, in substance meant an amount not less than $85 a share "earmarked for the stockholders as a return of investment," and there was "set a floor below which it appeared their recovery of investment could not fall."

The cash consideration, as has been noted, was to be paid for the assets of the company, and, moreover, was to be paid to the company and not to the stockholders. An easy way to provide for a net amount to the stockholders would have been for them to sell their stock. It likewise would not have been difficult, where the sale was by the company of its assets, to stipulate that the cash consideration "was in all events and at every hazard to be a net amount always available without diminution for any cause." *Boston & Providence Railroad* v. *Old Colony Railroad*, 269 Mass. 190, 197. This contention of the company does not convince us that the general rule, which is against shifting the tax burden, is inapplicable. We do not here discover "overbalancing considerations" to which the general rule must yield. The language which the parties saw fit to employ seems to us to show no intent that the cash payment was to be in such added amount as to ensure a net return of $85 on each

share of stock, and we think it would be a strained construction to hold that it did. See *Codman* v. *American Piano Co.* 229 Mass. 285, 291; *Boston & Maine Railroad* v. *Peterborough Railroad*, 86 N. H. 217, 220–221.

Nor are we moved by the provision that a sale under the option "shall work a dissolution of the company" (St. 1931, c. 333, § 17, superseding Spec. St. 1918, c. 159, § 16). The dissolution is not instantaneous and complete, but is expressly subject to the general statutory provisions relative to the dissolution of corporations. G. L. (Ter. Ed.) c. 155, § 51. The three years thus afforded ordinarily would be ample for the company to dispose of a matter like the "capital gain" tax and otherwise to settle and close its affairs. There was no assumption of "accruing taxes," as in *National Bank* v. *Minary*, 221 Ky. 798. We do not have a case like *Shepard* v. *Commissioner of Internal Revenue*, 101 Fed. (2d) 595 (C. C. A. 7), where a corporation sold all its assets for a consideration paid to its stockholders, and a purchaser, who had assumed "all existing liabilities," was held liable for a Federal tax on the corporation's profit arising from the sale, as otherwise the contract of purchase would have been fraudulent. For examples of cases like the *Shepard* case, see *Helvering* v. *Wheeling Mold & Foundry Co.* 71 Fed. (2d) 749, 751 (C. C. A. 4); *Buck* v. *Kleiber Motor Co.* 97 Fed. (2d) 557 (C. C. A. 9); *Sample Furniture Shops, Inc.* v. *Commissioner of Internal Revenue*, 123 Fed. (2d) 90, 92 (C. C. A. 4).

The company argues that "the result to the company should be the same as if public control had been terminated followed by a sale by the company of its assets at the option price." We do not accede. This seems to us to be entirely devoid of bearing upon the construction of the contract as made.

2. The remaining questions are raised by the counterclaim. The public control act provided: "The stockholders of the company shall, as heretofore, elect a board of directors which shall, however, during the period of public operation, have no control over the management and operation of the street railway system, but its duties shall be confined to maintaining the corporate organization, protecting the interests of the corporation so far as necessary, and tak-

ing such action from time to time as may be deemed expedient in cases, if any, where the trustees cannot act in its place. . . . Such sum as may be deemed reasonable shall be allowed to the board of directors each year by the trustees to provide for the maintenance of the corporate organization of the company and the performance of such duties as may be necessary by the company and the directors." Spec. St. 1918, c. 159, § 4.

The bills in question, for the services of the chairman of the board of directors and for the services and disbursements of two firms of lawyers engaged by the company, arose prior to the closing on August 29. The only issue is whether these obligations represented "outstanding indebtedness and liabilities" within St. 1931, c. 333, § 17, and St. 1947, c. 544, § 5. The authority contends that "only outstanding indebtedness and liabilities incurred as an incident to the operation" of the railway system were assumed; that these bills "are extraordinary expenses incurred by the board of directors of the company in an effort to force recognition of claims of the company with respect to the price to be paid for the property"; and that this part of the case is governed by *Falmouth* v. *Falmouth Water Co.* 180 Mass. 325, 333–334.

An examination of the bills, however — and they are all we have before us — does not show that the services were entirely as contended by the authority. That of the chairman of the board of directors "for extra services . . . with respect to problems arising in connection with the purchase" on that statement was plainly an assumed liability. The lawyers' bills covered services respectively described to be "in particular" and "particularly" with respect to the assumption of the tax, but there were also substantial services regarding the exercise of the option and the sale, including preparation of the pleadings and participation in hearings in this case in the Superior Court. One of the purposes of bringing this suit was to resist certain provisions of St. 1947, c. 544. This action was necessary for "protecting the interests of the corporation," and its undertaking was the duty of the board of directors, as it was an

occasion "where the trustees cannot act in its place." By the consent decree this objective was achieved. The company was also entitled to independent representation as to the sale.

This is not a case for remand for further findings to apportion the charges (see *Watkins* v. *Simplex Time Recorder Co.* 316 Mass. 217, 224–225), because we are of the opinion that, under Spec. St. 1918, c. 159, § 4, even the steps taken up to August 29 to throw the "capital gain" tax onto the authority were within the duties of the board of directors for "protecting the interests of the corporation" in a matter as to which the trustees could not act. Hence, the expense so incurred fell within the statutory provision that "Such sum as may be deemed reasonable shall be allowed to the board of directors each year by the trustees to provide for . . . the performance of such duties as may be necessary by the company and the directors." No question has been raised as to the reasonableness of the amounts of the bills or as to the apparent absence of any determination of such fact by the trustees.

3. A decree is to be entered declaring that the "capital gain" tax was not assumed by the authority, and that the several bills which are the subject of the counterclaim were assumed.

*So ordered.*